CHARLES A. HUNTER AND HENRIETTA MALATESTA, PROSECUTORS, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF TEANECK, AND CORNELIUS J. HARTE, CHIEF OF POLICE OF THE TOWNSHIP OF TEANECK, RESPONDENTS.

Argued October 8, 1941—Decided February 24, 1942.

Before Justices BODINE, PERSKIE and PORTER.

For the prosecutors, *Abram A. Lebson* (*Seymour A. Smith*, of counsel).

For the respondents, *Donald M. Waesche.*

*Amicus curiæ, Louis A. Fast.*

The opinion of the court was delivered by

PERSKIE, J. The primary question requiring decision in this cause is whether the ordinance prohibiting the keeping of pin ball machines in any place of business in the Township of Teaneck, is *ultra vires*.

On March 18th, 1941, respondent Township of Teaneck passed an ordinance (No. 781) prohibiting the "keeping" of any "game of chance" or "gambling device" in any place of "business" within the municipality. *N. J. S. A.* 40:48-1 (¶ 6); 40:48-2.

Section 1 of the ordinance provides that any "game, machine, apparatus or device such as is commonly called bagatelle, *pin ball,* or roulette, and any game, machine * * * of like nature by whatever name known should be deemed and regarded as a game of chance or gambling device."

Section 2 provides that "no person shall have, or keep, in any store, shop, tavern, restaurant or other place of business within the Township of Teaneck * * * any game, machine, apparatus or device such as * * * *pin ball* * * *."

Section 3 provides that the police of the township "are authorized to seize and hold for such further disposition as is authorized by law any game * * * pin ball found in any store * * * restaurant * * * or other place of business in the township * * *."

Section 4 provides that any person convicted for violating the provisions of the ordinances shall be subject "to a fine of not more than two hundred dollars, or imprisonment in the county jail not exceeding ninety days." *N. J. S. A.* 40:49-5.

The police of the township seized some of the banned pin ball machines. Whereupon prosecutor Saunders (substituted for Hunter) who owns pin ball machines and leases them to merchants in the Township of Teaneck and prosecutrix Malatesta, who had and kept a pin ball machine in her restaurant in the township (both hereafter referred to as prosecutors) made application for and were allowed a writ of *certiorari* by our Supreme Court, at the May term, 1941, to review the legality of the stated ordinance.

While prosecutors argue, among other things, that the question as to whether the ordinance is *ultra vires* the township is primarily one of law, while they "strenuously deny" that "pin ball machines *per se*" may properly be "deemed and regarded as a game of chance or as a gambling device," and while they challenge the materiality of the "voluminous testimony" for the township to the contrary, nevertheless, they substantially urge, at the outset, that "pin ball machines" are not gambling devices but devices used as "innocent games of amusement" depending upon the skill with which the machines are operated.

We think that the proofs are relevant. They afford the only proper and legal basis upon which we can reach the truth and take hold of the substance of the real issue. For, "no dressing, however adroit, can make legal that which is illegal." *Cf. State* v. *Berger,* 126 *N. J. L.* 39, 43; 17 *Atl. Rep.* (*2d*) 167.

Thus save as to its complicated mechanical features, a most general description of the construction and operation of the pin ball machines involved, some of which were exhibited to the court at the oral argument, is advisable.

The proofs disclose that the pin ball machines consist of two cabinets; one is horizontal and contains the playing board; the other upright and the front part thereof is the score board. Although the set-up of each playing board varies with each named machine, each in principle, is alike. The playing board is studded with obstructions and set up at an incline. A metal ball is propelled to the top of the playing board after it is struck by a plunger operated by the player. The ball then rolls down the playing board passing through certain spaces thereon or striking certain obstructions thereon, some of which have marked scoring value, some free game value, and some no value. As the ball rolls down the playing board it is accompanied by a succession of lights flashing on, or going out, bells or buzzers ringing and buzzing and numbers changing on the score board; and unless the ball on its downward course is lodged at some planned scoring point it finally reaches the trough at the end of the board provided for its reception.

The game is begun by the player (adult and minor) depositing a nickel in the slide of the machine. The slide is then pushed into the machine with the result that five metal balls are released. The playing of five balls constitutes a game. The player then pushes a lever which operates a rocker arm that lifts the balls, one at a time, into a narrow run-way at the right edge of the playing board and against the front end of the plunger. The player then draws back the plunger which compresses a spring so that when the plunger is released it forces or drives the metal ball up the run-way to the top of the playing board whence it takes the course first stated. Free games are awarded. Their number on some machines are as high as 60 to 94 games.

Each machine is designed and constructed so that there are two distinctly different methods of registering, on the award or free game meter attached to each machine, the number of pay offs of free games won. One is called the "Regular" and the other "Free Play." On the back of the score board there is an electric plug to be inserted into either side of a double socket regulating which method of play is to be employed.

When the game is set for "Regular" play free games cannot be played off. When the game is so set, every game requires the insertion of a nickel into the machine. All free games showing on the score board together with the total score are all removed with the beginning of every new game, and it is necessary for the lessee of the machine to pay the player the number of coins indicated by the free plays, if the player is to receive any award for a winning score or if he is to be permitted to play off the free games.

When the machine is set for "Free Play," free games may be played off without the insertion of an additional coin. If the lessee of the machine, however, pays off free games when won, when the machine is set for "Free Play," all the free games and total score may be removed from the score board by pressing a button, underneath the playing cabinet, provided for that purpose.

The machines contain no meter to register the number of coins put into it, nor to register the number of games played.

The reason is obvious. The owner is not concerned with the number of games played; for he alone has access to the coin box. But he is concerned with the number of free games played. For a sum equal to that number (based on the price of play of each game) is repaid to the lessee and the balance of the coins in the box is divided, on an agreed basis, between the owner and the lessee.

Thus it becomes abundantly clear that the meter attached to each machine registers only games *paid off* and not games *played off*. When set for "Free Play" the award meter does not register the free games as they are won because they may be played off. When so set, the award meter registers only those free games removed from the score board by pressing the button underneath the cabinet, because they are the only free games paid off. In other words, when set for "Free Play," it registers only the free games won and not played off.

The proofs further show that a sheet of instructions in one of the machines stated that each number recorded on the free play meter showed that five cents had been awarded therefor. Other record cards taken from one of the coin boxes of a machine actually showed a credit given to the lessee for the free games paid off.

1. In light of the stated proofs, is the pin ball game a game of chance and are pin ball machines gaming devices? Various factors have been held to be determinative as to what constitutes a game of chance. There is a line of cases, of which *People* v. *Lavin* (1904), 179 *N. Y.* 164; 71 *N. E. Rep.* 753; 66 *L. R. A.* 601, and *Commonwealth* v. *Plisner* (1936), 295 *Mass.* 457; 4 *N. E. Rep.* (2d) 241, are typical, holding that the test of the character of the game is not whether it contains the element of chance or the element of skill, but which is the dominant element that determines the result of the game. There is another line of cases, of which *State, ex rel. Dussault* v. *Kilburn* (1941), 111 *Mont.* 400; 109 *Pac. Rep.* (2d) 1113; 135 *A. L. R.* 99, is typical, holding that if the game is designed to and does appeal to, and induces, lures, and encourages, the gambling instinct, it constitutes a game of chance. And there is a further line of cases, of which *Alexander* v. *Martin* (1939), 192 *S. C.* 176; 6 *S. E.*

*Rep.* (*2d*) 20, and *Alexander* v. *Hunnicutt* (1941), 196 *S. C.* 364; 13 *S. E. Rep.* (*2d*) 630, are typical, holding that since amusement has value, and added amusement has additional value, and since that additional amusement is obtained by chance without the payment of additional compensation therefor, there is involved in the game the three necessary elements of gambling, viz., chance, price and prize.

The proofs in the case at bar are plenary in support of any one or all of the aforestated determinative factors. Here the predominant element of the game is chance. Here the game is designed to and does appeal to, and induces, lures, and encourages, the gambling instinct of winning free games which may either be converted into cash or used for additional amusement without additional compensation therefor. See Annotation (Games of chance or skill), 135 *A. L. R.* 105, 149.

The facts that the pin ball machines were licensed by the township under its ordinance (No. 683) for five years prior to the passage of the ordinance under review, and that the Federal Government, under the Federal Revenue Act of 1941, section 555 (Part IX, coin operated amusement and gaming devices) section 3267, imposed a tax on pin ball machines, are altogether beside the point. These are revenue measures. The imposition of a tax for revenue by a municipality is not necessarily any more determinative of the legality of the thing licensed than the imposition of a tax on income by the Federal Government is necessarily determinative of the legality of the source of the income. And the fact that police officials, educators and others of the 25,000 inhabitants of the township failed to see any illegal use made of the machines is only material, if true (there is proof to the contrary), as to the extent to which their gambling instinct blinded them to the obvious.

Notwithstanding our decisions in *State* v. *Hall*, 32 *N. J. L.* 158, and *Breninger* v. *Belvidere*, 44 *Id.* 350, both of which are clearly distinguishable on their facts, we have no hesitancy in factually and legally stamping the pin ball game as a game of chance. The pin ball machines involved are nothing but ingeniously designed and purposefully constructed mechanical gaming devices to appeal to, induce, lure and

encourage, the gaming instinct in the public generally and children particularly.

2. Prosecutors further argue that even if pin ball games and pin ball machines may properly and legally be deemed and regarded to be games of chance and gambling devices, respectively, the ordinance is, nevertheless, *ultra vires* the township.

That argument is rested upon the premises that the penalty provision of the ordinance (section 4) diminishes the punishment provided for "games of chance" or "gambling," at the time of the amendment of article IV, section 7, paragraph 2, of our State Constitution (July 11th, 1939). Prosecutors construct that premise by placing the provisions of the challenged ordinance within *N. J. S. A.* 2:135-2, which provides that "Any person who shall have or keep in his place of business, or other premises, any slot machine or device in the nature of a slot machine, which may be used for the playing of money or other valuable thing, shall be guilty of a misdemeanor." Having thus denominated the subject-matter of the ordinance a misdemeanor, prosecutors place the punishment therefor within *N. J. S. A.* 2:103-6 which provides for a fine not exceeding $1,000 or imprisonment for a term of three years, or both.

For the township it is argued that the ordinance does not infringe upon the provisions of the Gaming Act, *N. J. S. A.* 2:135-2; that the latter relates to those who may "have or keep," in the places therein stated, a "slot machine" (definition of which was unknown to the common law or statutory law) which "may be used" for the playing of money or other valuable thing (*Cf. State* v. *Brandt,* 122 *N. J. L.* 488; 6 *Atl. Rep.* (2d) 203); whereas the ordinance under review relates to those who may "have or keep" in the places therein stated, gambling devices (pin ball machines) without provision as to their use as such devices.

Be that as it may, we choose to decide the question first posed as requiring decision in this case on the premise that a pin ball game is a "game of chance;" that pin ball machines are gambling devices; that possession of pin ball machines here involved, unlike the possession of lottery slips in *State*

v. *Murzda,* 116 *N. J. L.* 226; 183 *Atl. Rep.* 305, constitutes not only an "ingredient" (*Id.,* at *p.* 226) of the "game of chance" prohibited by the stated constitutional amendment but the machines themselves are the indispensable, specifically designed devices for the playing of such games.

On the stated premise, the ordinance is not *ultra vires* the township. The object of the ordinance is "to strike at the evil in its inception by a measure that is primarily preventive in character." *State* v. *Murzda, supra* (at *p.* 226). That object is clearly within the police powers which have been delegated to municipalities in very broad, general and comprehensive terms by *N. J. S. A.* 40:48-1 and 40:48-2. These terms have for their source the provisions of our Home Rule Act, *Pamph. L.* 1917, *ch.* 152, *art. XIV,* §§ 1 and 2, respectively. And by the provisions of section 26 of the same. act (*N. J. S. A.* 40:42-4) the legislature charged "all courts" with the duty of construing the act "most favorably to municipalities," it being the intention of the legislature to give to all municipalities, to which the act applies, "the fullest and most complete powers possible over the internal affairs of such municipalities for local self government."

Thus even if the same act (having and keeping a purposefully designed gambling device) may constitute an offense against the state, as claimed for prosecutors, and an offense against the township, we think that the act falls within that category which permits both the state and municipality to punish for the violation thereof without violation of any constitutional principle. *Cf. Howe* v. *Treasurer of Plainfield,* 37 *N. J. L.* 145.

3. While it would have been better craftsmanship to have followed the wording of *N. J. S. A.* 40:49-5, and thus to have added the words "or both" to the penalty provisions of the ordinance (section 4), we do not regard that omission fatal. *N. J. S. A.* 40:49-5 confers upon magistrates, in their discretion, the power to commit as an aid in the collection of the fines imposed. *Thorne* v. *Kearny,* 100 *N. J. L.* 228; 126 *Atl. Rep.* 613; *affirmed, sub nomine, Thorne* v. *Casale,* 101 *N. J. L.* 418; 128 *Atl. Rep.* 174. Nor does the penalty provision deprive the magistrate of his discretion to impose a

lesser penalty than the prescribed maximum. *Cf. Pfister Chemical Co.* v. *Romano,* 15 *N. J. Mis. R.* 71; 188 *Atl. Rep.* 727.

4. Being a valid exercise of the police powers, the ordinance does not violate any of prosecutors' federal or state constitutional rights.

We have carefully considered all other points argued and find them to be without merit.

Accordingly, the writ is dismissed, with costs.