20 N.J. Super. 132 (1952)
89 A.2d 280
WILLIAM C. O'BRIEN, JR., AND THOMAS O'CONNELL, T/A SKILO, PLAINTIFFS,
v.
LEWIS P. SCOTT, COUNTY PROSECUTOR OF THE COUNTY OF ATLANTIC, AND EARL BUTCHER, ACTING CHIEF OF POLICE OF THE CITY OF ATLANTIC CITY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 4, 1952.
*133 Mr. Edward I. Feinberg, attorney for plaintiffs.
Mr. David R. Brone, First Assistant Prosecutor, attorney for defendant Lewis P. Scott.
Mr. Murray Fredericks, City Solicitor of Atlantic City, (Mr. Chaim H. Sandler and Mr. Daniel J. Dowling, Associate City Solicitors, of counsel), attorney for defendant Earl Butcher.
HANEMAN, J.S.C.
Plaintiffs herein are the lessees of certain premises located at 192 St. James Place, Atlantic City, New Jersey, in which they are conducting the business of operating an alleged amusement skill game known as "Skilo." The complaint alleges that the defendants, who are various law enforcement officers of the City of Atlantic City and County of Atlantic, have arbitrarily interfered with the conduct of their business without due process of law. The plaintiffs seek to enjoin the defendants from so arbitrarily interfering with their business.
On August 8, 1951, upon application made to the Honorable C. Thomas Schettino, J.S.C., an interlocutory injunction was granted restraining the defendants from interfering with the operation of the plaintiffs' business, except *134 pursuant to proceedings in accordance with due process of law. Said restraint was based on a finding of fact by him that the device here in question "was one of skill and therefore legal."
Counsel have stipulated in the pretrial order that the sole question to be resolved by this court is whether said game is one of chance or one of skill. The question of the illegal or arbitrary nature of the acts of the defendants is therefore not one for determination in this cause. It is admitted by the defendants that an injunction will properly lie where the character of a game, as to legality or illegality, is in substantial dispute, and where valuable property rights are threatened with irreparable injury or destruction from the seizure and interference by police authorities acting without due process of law. S. & R. Amusement Corp. v. Quinn, 136 N.J. Eq. 420 (Ch. 1944).
In order to sustain the propriety of their conduct, the defendants seek a declaration that the device or game here involved is a gambling device interdicted by the provisions of N.J.S. 2A:112-3. So much thereof as is here pertinent is as follows:
"Any person who, habitually or otherwise, * * *, or keeps a place to which persons may resort for engaging in any such practices, * * *, or for gambling in any form, is guilty of a misdemeanor, and shall be punished by a fine of not less than $1000 nor more than $5000, or by imprisonment in the State prison for not less than 1 year nor more than 5 years, or both."
That the above statute proscribes the keeping of a place "for gambling in any form" is clear, for it follows that if the playing of the machines or devices owned and operated by plaintiffs in the above referred to premises constitutes gambling, plaintiffs are guilty of violating the cited statute. State v. Ford, 86 N.J.L. 73 (Sup. Ct. 1914); Thrillo, Inc., v. Scott, 15 N.J. Super. 124 (Cty. Ct. 1951).
Thus our inquiry resolves itself into two issues: (1) what constitutes a gambling device or game, and (2) is the game here involved a gambling device or machine?
*135 First, our inquiry is directed to the issue of what constitutes a gambling device or game.
In State v. Murzda, 116 N.J.L. 219 (E. & A. 1935), it was stated as follows:
"The term `gambling device,' has no settled and definite meaning; it was not defined by the common law. State v. Mann, 2 Or. 238. Unless specifically defined, it takes its meaning from the surrounding words and expressions, and, when given the restricted significance of implements, instruments, or apparatus used in the unlawful play or game, that is ordinarily the intention found in the context. State v. Mann, supra; State v. Shaw, 39 Minn. 153, 39 N.W. 305; In re Lee Tong, D.C., 18 Fed. Rep. 253; State v. Mann, 13 Tex. 61."
In Washington Coin Machine Ass'n. v. Callahan, &c., 79 U.S. App. D.C. 41, 142 F.2d 97, 98 (C.A.D.C. 1944), the court said as follows:
"To gamble, as is well known, is to risk one's money or other property upon an event, chance or contingency in the hope of the realization of gain, and the test as to whether a particular machine combination constitutes a gambling device is, as the Seventh Circuit Court of Appeals said, whether it is adapted, devised and designed for the purpose of playing any game of chance for money or property. The elements, chance and money or property, are therefore fundamental ingredients. * * *"
See also, Chicago Patent Corp. v. Genco, Inc., 124 F.2d 725 (C.C.A. 7th 1941).
The courts of New Jersey have never established a specific test for a gambling game. In Hunter v. Teaneck Township, 128 N.J.L. 164 (Sup. Ct. 1942), the court said as follows:
"Various factors have been held to be determinative as to what constitutes a game of chance. There is a line of cases, of which People v. Lavin (1904), 179 N.Y. 164; 71 N.E. Rep. 753; 66 L.R.A. 601, and Commonwealth v. Plissner (1936), 295 Mass. 457; 4 N.E. Rep. (2d) 241, are typical, holding that the test of the character of the game is not whether it contains the element of chance or the element of skill, but which is the dominant element that determines the result of the game. There is another line of cases, of which State ex rel. Dussault v. Kilburn (1941), 111 Mont. 400; 109 Pac. Rep. (2d) 1113; 135 A.L.R. 99, is typical, holding that if the game is designed to and does appeal to, and induces, lures, and encourages, the gambling instinct, it constitutes a game of chance. And *136 there is a further line of cases, of which Alexander v. Martin (1939), 192 S.C. 176; 6 S.E. Rep. (2d) 20, and Alexander v. Hunnicutt, (1941), 196 S.C. 364; 13 S.E. Rep. (2d) 630, are typical, holding that since amusement has value, and added amusement has additional value, and since that additional amusement is obtained by chance without the payment of additional compensation therefor, there is involved in the game the three necessary elements of gambling, viz., chance, price and prize."
In the case above quoted, it is to be noted that the game was found to be a gambling device, as it had all three of the above determinative factors. However, the court did not determine which of the tests were to be applied in this State. S. & R. Amusement Corp. v. Quinn, supra.
The first of the tests set forth in Hunter v. Teaneck Township, supra, which is apparently the test upon which counsel herein have predicated their arguments, fails in several particulars to furnish a proper test of whether it is a gambling machine or device.
The statute here in question reads, in full, as follows:
"Any person who, habitually or otherwise, buys or sells what is commonly known as a pool, or any interest or share therein, or makes or takes what is commonly known as a book, upon the running, pacing or trotting, either within or without this state, of any horse, mare or gelding, or conducts the practices commonly known as bookmaking or pool selling, or keeps a place to which persons may resort for engaging in any such practices, or for betting upon the event of any horse race or other race or contest, either within or without this state, or for gambling in any form, is guilty of a misdemeanor."
Gambling has been defined in Webster's New International Dictionary, as follows:
"Gamble: To stake money or any other thing of value upon an uncertain event, to hazard, wager."
"Gambling: A transaction involving gambling; hence, anything involving similar uncertainty."
"Gambling: The action of one who gambles. Properly, the act of playing or gaming for stakes. Loosely, the act of risking or staking anything on an uncertain event, wagering. In the strict sense of the term, gambling implies a playing or gaming, as at checkers, dice, cards, horse racing, cockfighting, or some other sport or contest, as well as a staking or risking of money to be lost or won on the issue."
*137 Considering the meaning of the words "gambling in any form," both in the light of the surrounding words of the statute and the above dictionary definition of the word "gambling," it becomes patent that more is required than that a person merely keep a place where games are operated, the result of which is determined by chance. There must be additional elements of price (wager) and prize (reward).
The second of the tests set forth in Hunter v. Teaneck Township, supra, fails as well to furnish an adequate criterion. It begs the question, by making the test "designed to and does appeal to * * * the gambling instinct" without defining "gambling." Thus we are again relegated to an ascertainment of the meaning of the basic word "gambling."
The third test seems best fitted to serve as a criterion. Therefore, by the use of the words "gambling in any form," as set forth in N.J.S. 2A:112-3, the Legislature intended to proscribe games constituted of the three elements, i.e., chance, price and prize.
Thus, the sole remaining consideration under the first issue is, what elements determine whether a game be one of chance or one of skill.
"Game of chance. The phrase `game of chance,' it has been said, is not one long known in the law and having therein a settled signification. It is a game determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or adroitness have honestly no office at all, or are thwarted by chance; a game in which hazard entirely predominates; one in which the result as to success or failure depends less on the skill and experience of the player than on purely fortuitous or accidental circumstances incidental to the game or the manner of playing it or the device or apparatus with which it is played, but not under the control of the player. * * *
* * * Games of skill are usually lawful, while gambling by any species of games of chance is generally considered unlawful. The test of the character of the game is, not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game, or, alternatively, whether or not the element of chance is present in such a manner as to thwart the exercise of skill or judgment. It is the character of the game, and not the skill or want of skill of the player, which determines whether the game is one of chance or skill. A game of chance does not cease to be such because it calls for the exercise of *138 skill, nor does a game of skill cease to be such because at times its result is determined by some unforeseen accident."
(38 C.J.S., Gaming, p. 35, sec. 1.)
In 24 Am. Jur., p. 410, sec. 18, it is stated as follows:
"A `game of chance' is said to be such a game as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, and adroitness have no office at all, or are thwarted by chance. * * * Games of cards do not, however, cease to be games of chance because they call for the exercise of skill by the players, nor do games of billiards cease to be games of skill because at times, especially in the case of tyros, their result is determined by some unforeseen accident, usually called `luck.' The test of the character of the game is not whether it contains an element of chance or an element of skill, but which of these is the dominating element that determines the result of the game."
In the light of the foregoing authority it is manifest that the character of a game, as to skill or chance, is determined by which of those two elements is the dominating factor in determining the result of the game.
Having in mind the foregoing tests, our inquiry reduces itself to an application thereof in seeking an answer to the second propounded question, i.e., is "Skilo" a gambling device or game?
This necessitates a description of the physical parts of "Skilo" and an explanation of the mechanics of the playing thereof. "Skilo" is played as follows: Each player purchases a checker-board card or cards on which there are five rows of numbers that run vertically, horizontally or diagonally, and the numbers on each card vary and do not necessarily correspond with the numbers on any other card. In front of each player is a rectangular box which stands about waist high and in which there are 75 holes numbered from 1 to 75. After an announcer gives the signal, each player throws a ball into his individual box, the object being to make an effort to lodge the ball in a hole corresponding with numbers on his card. The players continue their efforts to fill out the numbers on said cards by repeating this procedure until they obtain a vertical, horizontal or diagonal row of numbers, and *139 the first player who completes a row of numbers in that manner becomes the winner. Each player receives the same number of balls for each game. At the start of each game the announcer announces the prize for that particular game, and in some games it is announced that additional points will be given to the winner, depending upon the number of cards purchased by that particular participant.
Since two of the requisite elements to constitute "Skilo" a gambling game  price and prize  are admittedly present, the inquiry is reduced to an ascertainment of whether it is a matter of skill or chance that determines the success of a player to lodge a ball in a given hole whose number corresponds with the number on a given player's card or cards.
To support their contention that the game here involved is one of skill, the plaintiffs produced Dr. Harold William Kuhn, who is now a mathematics lecturer at Princeton University. He received his bachelor of science degree at the California Institute of Technology, and his doctorate at Yale and Princeton Universities, and was a research scholar at the Sorbonne, France. Dr. Kuhn has also collaborated on the editing of a book entitled Contributions to the Theory of Games, an analytical treatise on the mathematics of games.
After qualifying, without objection, as an expert witness to testify as to whether "Skilo" is a game of skill or chance, Dr. Kuhn testified that he had made a statistical study and survey of the game and came to the conclusion that it was one of skill, and that skill predominates over chance.
Dr. Kuhn testified that games of skill and chance are set off by two fundamental criteria. First, an expert or skilled player can win a substantial majority of games of skill from a novice or unskilled player; and second, in a game of skill which is won by the lowest score, an expert or skilled player will make, on the average, a substantially lower score than a novice or unskilled player. Neither of these results are true in a game of chance.
Dr. Kuhn conducted a series of tests which were stipulated to be legitimate by all of the parties involved in this litigation. *140 He chose two persons who were recognized as especially skilful, and two who were of average skill. He chose two average players rather than two who had never played the game, but still classified them as novices, in spite of the fact that they had, at the time of the experiment, obtained some skill in the play. In order to determine whether the so-called novices were actually trying, Dr. Kuhn made a blindfold test, the result of which is hereafter recited. The skilled players and novices played 100 games in a series of 25 games each. The results were as follows:
Series 1: The experts won 20 out of 25 games. The novices won 5 games. There were no ties.
Series 2: The experts won 19 out of 25 games. The novices won 4 games. There were 2 ties.
Series 3: The experts won 20 out of 25 games. The novices won 5 games. There were no ties.
Series 4: The experts won 18 out of 25 games. The novices won 6 games. There was 1 tie.
In the entire series of 100 games, the experts won in 77 out of 100 games, with 3 ties.
As Dr. Kuhn testified, it is obvious from this undisputed test that the experts were substantially better than novices or average players, and one can judge from the mathematical theory of probability just how much better they were. If this game were one of chance, then the experts and average players would have had the same opportunity of winning, and each would win probably one-half of the games. This may be compared with the flipping of a coin, with the experts winning on heads and the average players winning on tails. Using a table based upon the binomial probability distribution theory prepared by the National Bureau of Standards, Dr. Kuhn testified as to the probability of these results occurring were this a game of chance. He testified that if one assumes that the experts and novices are equally matched, or that this is a game of chance, then according to these tests, the chances of the results obtained in Series 1 occurring are 1 in 500; in Series 2, 7 out of 1,000; in Series 3, 1 in *141 500, and in Series 4, 1 in 50, and of the entire set of 100 games, 1 chance in 16,000,000. If "Skilo" were primarily a game of chance there would be no distinguishable way that one could separate skill from chance, as every player would have an equal opportunity to win.
The test for the second criterion above referred to, namely, that a skilled player will go out with a substantially lower number of tosses than a novice or average player, exhibited the following:
Series 1: Experts  14.3 balls. Novices  22.4 balls. Series 2: Experts  14 balls. Novices  16.3 balls. Series 3: Experts  13.50 balls. Novices  18 balls. Series 4: Experts  15.3 balls. Novices  17.3 balls.
The average for the entire series was 14.3 for the experts to 18.2 for the novices.
Dr. Kuhn stated that there are standard mathematical tests by which the differences above shown are tested. They are the same sort of tests that one uses to decide whether two groups of men are physically different, by checking chest measurements, etc. These tests are used in industry to decide whether two products are substantially the same in quality. In applying such tests one finds that the chances of having players of the same skill obtaining these different averages in a group of 100 games are approximately 1 in 10,000. There is little chance that players of equal skill would get averages of such a different nature in 100 games. The significant difference in scores is a clear indication that the experts are more skillful than the novices or average players, and these results could probably not have been obtained were "Skilo" a game of chance.
The results of the blindfold test above noted were as follows: In playing 15 games, the average number of tosses to complete a game was 27.8. With these results, Dr. Kuhn concluded that even the novices had achieved a certain amount of skill, as their average in the series of 100 games was 18.2. It is interesting to observe that Dr. Kuhn, after playing a *142 certain number of games of "Skilo" stated that he had acquired a noticeable amount of skill in the short space of time he was acquainted with the game.
In support of their position, defendants produced four witnesses, each of whom was either a member of the Atlantic City Police Department or the Atlantic County Prosecutor's office, who testified that their endeavors to acquire skill had failed.
The acquisition of skill in the playing of any game depends upon the practice and aptitude of the participant, as is manifested in the playing of golf. This failure to obtain skill by said witnesses may be attributed to any number of circumstances and does not overcome the conclusion, from the foregoing, that the game of "Skilo" is one predominantly of skill.
In contradiction of this evidence of defendants, and in substantiation of the contention that this is a game of skill, is the testimony of Fred L. Packard, who testified for the plaintiffs and who, under cross-examination, testified that although he had not barred skillful players from participating, he had interceded with such players to abstain from playing, as the less skillful players continuously protested the frequent winning by more skillful players.
It is therefore held that "Skilo" is predominantly a game of skill and not a game of chance, hence, it is not a gambling game. It follows that "Skilo," lacking one of the essential elements to constitute it a machine or device for gambling, the plaintiffs are not keeping a place for gambling in contravention of N.J.S. 2A:112-3.
The injunction sought against the defendants will be made absolute.