43 N.J. Super. 128 (1956)
127 A.2d 906
ABE RUBEN, PLAINTIFF,
v.
VINCENT P. KEUPER, PROSECUTOR OF THE COUNTY OF MONMOUTH, ET AL., DEFENDANTS. R. AND P. AMUSEMENT CO., INC., A CORPORATION, PLAINTIFF,
v.
ROBERT A. LEDERER, PROSECUTOR OF THE COUNTY OF OCEAN, ET AL., DEFENDANTS. SKILL AMUSEMENT, INC., A CORPORATION, PLAINTIFF,
v.
ROBERT A. LEDERER, PROSECUTOR OF THE COUNTY OF OCEAN, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 20, 1956.
*129 Mr. John E. Toolan (Messrs. Toolan, Haney & Romond, attorneys), attorney for plaintiffs.
Mr. Solomon Lautman (Mr. Vincent P. Keuper, Mr. Robert A. Lederer, and Mr. Robert J. Novins, attorneys), attorney for defendants.
CONFORD, J.A.D. (temporarily assigned).
The three above-captioned causes came on for hearing and were consolidated for trial by consent as involving common questions of law and fact. In each the plaintiff is the commercial operator of a game conducted in a shore resort community and charges that the defendant law enforcement officials visited its premises in the summer of 1956, informed it that *130 its business was in violation of law, and threatened arrest of the managing personnel and closure of the enterprise if it did not desist in the operation. Plaintiffs complain that their businesses are not in violation of law and that the threats of defendants if carried out will cause them great and irreparable damage. They seek permanent injunctions against any further interference by the defendants. See S. & R. Amusement Corp. v. Quinn, 136 N.J. Eq. 420 (Ch. 1944).
A single factual issue was tried at the hearing  whether, and the extent to which the games involved are games of chance, rather than of skill, in violation of N.J.S. 2A:112-3, which punishes as a misdemeanor the keeping of "a place to which persons may resort * * * for gambling in any form." The defendants maintain that the operations of plaintiffs are unlawful for the additional reasons that they violate N.J.S. 2A:112-1, prohibiting the "playing for money" with "tables," and that, because any kind of wagering or betting for stakes upon an unknown or contingent event is unlawful, under N.J.S. 2A:40-1, the maintenance of these establishments is a criminal nuisance, regardless of the matter of the skill of the player at the games, under N.J.S. 2A:130-2; 2A:130-3 (see State v. Western Union Telegraph Co., 12 N.J. 468, 490 (1953), approving the definition of gambling as "the act of risking or staking anything on an uncertain event"), as well as the keeping of a disorderly house at common law, State v. Berman, 120 N.J.L. 381, 382 (Sup. Ct. 1938). For purposes of the determination of the present matter, however, it will suffice to consider whether plaintiffs have succeeded in their effort to prove the contention posed by the pretrial orders that these games consist "entirely of skill and dexterity and that the element of chance is altogether absent therefrom," or, alternatively, that "the dominant factor is skill, not chance."
The game involved in the Ruben and Skill Amusement Co. cases is known as "Fascination"; in the other case it is "Pitch Fascination." The fundamental principles of these games are similar; only in mechanics of operation do they *131 differ. In Fascination there are individual play devices for each of a maximum of 52 players playing simultaneously. The player rolls a small rubber ball along a table on a gradient plane at the end of which there is a square arrangement of 25 holes consisting of five vertical and five horizontal rows of holes. After propulsion, the ball rolls back to the player for the next play. As a ball enters a hole an electrical device lights up the location on a reproduction of the playing grid set up on a vertical backboard of the device. Between the player and the holes is placed a plastic barrier which the ball must surmount before reaching the hole area. The ball is about 1-3/16 inches in diameter; the hole about 3/16 inches wider. The first player who lights up an entire 5-hole row, either vertically, horizontally, or diagonally, is the winner, and, for his ten-cents playing fee, receives $1; if he "makes" the bottom row, the prize is $5; if the second horizontal row, $2. The other players lose their dimes to the house. About 30 games are played each hour. On an average busy evening more than half the playing places will be occupied at any given time.
In "Pitch Fascination" there is a similar 25-hole grid, but enclosed by glass partitions on four sides, and the balls are thrown by the player into the enclosure, each player simultaneously throwing one ball. In addition to the winning combinations as in Fascination, supra, there is a win also if the four corner holes, or the four center holes in each outside row, are filled. In this game the fee is also ten cents, but the amount of the prize is determined by the operator and announced at the outset of the game. It varies from $.50 to $2, depending upon the number of players. A special prize of $5 is awarded for a "perfect" diagonal row (on five thrown balls). There are generally no more than 25 players at a time, although on occasion there have been as many as 45.
In the case of all three plaintiffs it was established by the proofs that the sole income of the venture is constituted by the fees of contestants and that from the gross revenues so realized are paid normal business expenses such as rent, *132 payroll, taxes, insurance, supplies, etc., the remainder going to prizes, and, presumably, operator's profit.
The plaintiffs' case was rested substantially upon the expert testimony of Dr. Harold William Kuhn, Professor of Mathematics at Bryn Mawr College, a scholar and writer on the theory of probability as applied to the special field of the theory of games. He conducted several series of test games in both Fascination and Pitch Fascination between four selected players, two experts and two novices. The details of the proofs and of the elaborate documentary supporting exhibits need not be recounted at length. In the Pitch Fascination tests the experts won 54 games out of 75 played and in Fascination they won 31 out of 44. Moreover, in other experiments, the novices won more games than the experts when the latter were blindfolded. Dr. Kuhn's conclusions were that "the division of games between experts and novices, under normal conditions, is not determined primarily by chance. The experts are significantly better than the novices"; also, that "the visual control of the ball has a significant influence upon the outcome of a contest." Primarily upon this kind of proof plaintiffs erect their major argument that the significance of chance in these games is so slight as to take them out of the "gambling" category, within the test laid down in the leading case of State v. Ricciardi, 18 N.J. 441, 445 (1955), and reaffirmed in State v. Schneiderman, 20 N.J. 422, 427 (1956):
"The principle is settled that in determining the presence of gambling in a particular operation or form of activity, the criterion is not whether the element of skill is present to some degree but whether it or chance is the dominant factor in obtaining the desired result."
In Lucky Calendar Co. v. Cohen, 20 N.J. 451, 462 (1956), the Supreme Court struck down a scheme as an illegal lottery, saying, significantly: "The vice of the jingle scheme is not that it depends wholly on chance but that its determination depends in part on chance. This is sufficient to taint it," citing the Ricciardi case.
*133 The opinion in Martell v. Lane, 22 N.J. 110, 117 (1956), may be read as approving an even more rigid test than the "dominant factor" criterion stated in Ricciardi. It was there declared that in judging the offensiveness of a device, as against N.J.S. 2A:112-1, prohibiting playing for money with a device "`having one or more figures or numbers thereon,'" "it does not matter that skill predominates in the process"; further, and of conjoined significance in the present connection, that the keeping of a place for playing such a device would violate the "gambling in any form" interdiction of N.J.S. 2A:112-3.
In Ricciardi there was involved a prosecution for operating a "pinball" machine in alleged violation of N.J.S. 2A:112-2, prohibiting the keeping of slot machines or devices of that nature for purposes of gaming. There, too, it was contended by the defendant operator that a player could develop skill in the operation of the game which would enhance his chances of success and that the machines were therefore "not inherent gambling devices" (18 N.J., at page 444). To this the court responded (ibid.):
"The argument, of course, ignores the obvious fact that but a small percentage of the players have achieved the degree of skill necessary to cause the balls to follow the desired, rather than a random, route. The vast majority of the playing public necessarily wager their money against a result dictated by chance alone, and certainly as to them the play is a gamble no less than the play of the traditional `one-armed bandits.' State ex rel. Dussault v. Kilburn, 111 Mont. 400, 109 P.2d 1113, 135 A.L.R. 99 (Sup. Ct. 1941); State v. Coats, 158 Or. 122, 74 P.2d 1102 (Sup. Ct. 1938). The evil at which the statute is aimed is no less present in the `pinball' machine because skill can, in the case of some, be a contributing factor in the result achieved."
The quoted excerpt clearly points up the fallacy in plaintiffs' position. There is no denial of the factual premise that a player can develop an expertness in either of the games presently under examination sufficient to enable him to compete successfully in a contest with a novice. But plaintiffs' operations do not consist of the conduct of contests of that kind. Plaintiffs' case must be judged by what they *134 actually do, not by a theoretical analysis of an experiment that does not characterize what occurs in their establishments. The average game they run is one in which a score or more of casual boardwalk passersby of various degrees of inexpertness try their hand in competition with others of the same ilk, and against the house. These are games in which comparative novices can win an occasional prize and thus titillate themselves and others into continued participation. To them the lure is chance and not an opportunity to match skills. Whatever one may say as to the expert, there can be no question but that the average or novice player is risking his dime against the lucky contingency that his balls will fall into a winning combination sooner than those of any other contestant; nor that in the long run he will lose more than he will gain. As was stated by Mr. Justice Wachenfeld in formulating a test for determining predominance of skill or chance in Ricciardi, supra (18 N.J., at page 446):
"The difficulty lies, of course, in determining whether in the particular case one or the other element  chance or skill  predominates. We know of no test by which the boundary lines may be clearly marked for all the myriad forms of activity in which men engage. However, in the particular context, considering the evil at which the statute is aimed, we think a fair test would be whether a player possessing average skill would be successful more often than not in the venture. In view of the fact that there is not even a suggestion that the appellant was conducting his business as a philanthropy with an intent to donate his money to the public, we fully agree with the finding of the trial judge that chance and not skill is the predominant factor in the play of these machines."
So, too, here. Indeed, the proofs are that if a particular player wins inordinately, he is politely ushered out of the game lest he discourage the rank and file. Thus, most of the time, the play is by average or novice players. If "gambling" is an appropriate characterization of the conduct of some or most of the participants in the games, the plaintiffs are engaged in a violation of the criminal laws of the State, notwithstanding that some of the players may be deemed so skilled as not to be gambling. But even a skilled player, *135 competing against ten, twenty, or more average or casual players, any one of whom might win by pure chance, and the more the likelier, is gambling in the sense that "judgment, practice, skill, and adroitness" may be "thwarted by chance." 24 Am. Jur., Gaming and Prize Contests, § 18, p. 410. See the excerpt from Commonwealth v. Laniewski, 173 Pa. Super. 245, 98 A.2d 215, 216 (Super. Ct. 1953), quoted in Ricciardi (18 N.J., at page 445).
Plaintiffs cite and rely upon O'Brien v. Scott, 20 N.J. Super. 132 (Ch. Div. 1952), in which Dr. Kuhn was also a witness. In the light of the subsequent Supreme Court decisions cited above, the O'Brien case cannot be regarded as authoritative.
In the only reported decision to consider whether Fascination is an illegal device, S. & R. Amusement Corp. v. Quinn, supra, the conclusion was that "there is a very substantial doubt" as to illegality (136 N.J. Eq., at page 426). With all deference, there is no doubt in my mind on the matter. I conclude that each of the games in question is primarily and predominantly a game of chance and that plaintiffs' businesses are therefore in violation of the criminal statutes of the State as gambling operations. Judgments will be entered for defendants in each case.