Barry GLICK, Plaintiff,

v.

MTV NETWORKS, A DIVISION OF VIACOM INTERNATIONAL INC., Defendant.

No. 91 Civ. 2174 (KTD).

United States District Court, S.D. New York.

May 4, 1992.

Stern, Steiger, Croland, Tanenbaum & Schielke, P.A. (John J. Stern, William R. Kugelman, of counsel), Paramus, N.J., for plaintiff.

McCarter & English (Andrew T. Berry, Teresa L. Moore, of counsel), Newark, N.J., for defendant.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

Plaintiff Barry Glick commenced this civil action against defendant MTV Networks ("MTVN") to recover damages for violations of New Jersey's gambling laws.[1] The complaint was originally filed in the Superior Court of New Jersey on May 7, 1990. On June 4, 1990, the matter was removed on the basis of diversity jurisdiction to the

---

1. Glick seeks damages on behalf of himself and the state of New Jersey. Pursuant to N.J.S.A. § 2A:40–6, Glick is entitled to retain one-half of any recovery he obtains. The State of New Jersey will receive the other half. N.J.S.A. § 2A:40–6 provides:

If the person who shall lose and pay such money, or lose and deliver such thing or things as aforesaid [i.e., as stated in N.J.S.A. 2A:40–5], shall not, within [6 calendar months after payment or delivery], without collusion, sue for the money or other thing or things so lost and paid, or delivered, any other person may sue for and recover the same, with costs of suit, from such winner, depositary or stakeholder as aforesaid; the one moiety thereof to the use of the person suing for the same, and the other moiety to the use of the state; provided the action is instituted within 6 calendar months from and after the expiration of the time [stated above] for the loser to sue for the same.

United States District Court for the District of New Jersey. MTVN moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6),[2] or, in the alternative, to transfer the action to the Southern District of New York, pursuant to 28 U.S.C. 1404(a). Glick cross-moved for partial summary judgment and opposed the transfer. By opinion filed February 25, 1991, the action was transferred to the Southern District of New York.[3]

The facts are not in dispute. MTVN is a division of Viacom International Inc., a corporation engaged in various entertainment and communications businesses. MTVN offers several different programming networks, or channels. From August 12 through October 11, 1989, one of those channels, known as VH-1, sponsored a national promotional event in order to increase viewership. That event, a sweepstakes called the "VH-1 Corvette Collection" (the "Sweepstakes"), is the subject of this litigation.

The Sweepstakes was publicized over MTVN channels, through the media and through publicity events conducted nationwide. Over 20,000 prizes, including inexpensive watches, T-shirts, hats and key chains, were awarded daily during the Sweepstakes. The grand prize was a choice of either a collection of 36 Corvette automobiles, one from each model year from 1953 to 1989, or a 1989 Corvette plus

$200,000 in cash. There were three different ways of entering the Sweepstakes. Participants could: (1) call a "900" number, for which there was a $2.00 charge;[4] (2) request a toll-free "800" number by mail;[5] or, (3) complete and mail in an official entry blank.[6]

Whichever way they entered, participants could enter as often as they wished, were eligible for daily prizes, and had an equal chance of winning. Over one million people entered the Sweepstakes: 136,506 by way of the mail-in entry blank, 30,094 by dialing the "800" number, and 1,065,624 by calling the "900" number. Bonus prizes were awarded daily by random selection throughout the Sweepstakes. On October 14, 1989, the grand prize winner was selected at random by an independent organization. The winner opted for the collection of 36 Corvettes.

## DISCUSSION

The entry of summary judgment is mandated where the nonmovant fails to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The non-moving party cannot simply rely on its allegations. Rather, it " 'must set forth specific facts showing that there is a genu-

2. MTVN supported its motion to dismiss with matters outside the pleading and indicated that, accordingly, the motion should be treated as one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b).

3. According to MTVN's submissions, the court directed it to address the issue of transfer. Brief of Defendant in Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment and in Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss at 11–13. Glick opposed transfer. I cannot fathom why this action, involving only questions of law concerning the construction of the New Jersey constitution, New Jersey statutes and New Jersey law, was transferred to this court. It is not the first time that such a transfer has been effected from the District Court for the District of New Jersey. It may be that such questions of law are beyond the ken of the bench in New Jersey, or perhaps it is a means for someone to keep the docket clear.

4. Information concerning the charge was included as part of the promotional spots, in print advertising, and on entry blanks.

5. The rules required that all requests for the "800" number had to be received by midnight, October 3, 1989.

6. Free entry blanks were available at Camelot Music Stores, a national retail chain with one store located in New Jersey, and at promotional events conducted at large outdoor gatherings such as state fairs, concerts and car rallies. One such event was the August 14, 1989 Beach Boys concert at the Garden States Arts Center, where approximately 2000 entry blanks were given away. Several hundred entry blanks were distributed through the Camelot store in New Jersey. *Supplemental Affidavit of Leslye Schaefer.*

ine issue for trial.' " *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

■ Glick alleges that the Sweepstakes was prohibited under New Jersey law. Glick argues that:

> At the heart of MTVN's gambling scheme was the otherwise innocent telephone. In the most basic terms, MTVN induced people to place their wagers by simply calling a telephone number with a "900" prefix. Callers to "900" telephone numbers ... automatically incur a predetermined charge for the call. In this case the charge was $2.00. The charge then appears on the callers' monthly telephone bill as an obligation owed to the carrier that provided the number. Once collected the revenue is split between the carrier ... and [MTVN]. MTVN essentially relied upon the telephone company to be its runner in exchange for a cut of the take.

Plaintiff's Brief In Opposition to Defendant's Notice of Motion for Summary Judgment and in Support of Plaintiff's Cross–Motion for Partial Summary Judgment ("Plaintiff's Brief") at 2–3 (footnote and citation omitted). Stripped of its veneer of respectability, Glick continues, the Sweepstakes was nothing more than a nefarious gambling scheme whereby participants were unwittingly lured, by the prospect of a big return, into placing $2 wagers.

Glick argues that the Sweepstakes: (a) was an unlawful gambling scheme under the New Jersey constitution and N.J.S.A. § 2A:40–1[7], and, alternatively, (b) was a lottery in violation of New Jersey law. According to Glick, New Jersey law delineates

two categories of gambling activity. The New Jersey constitution sets the outer limits of conduct which is proscribed as "gambling." N.J.S.A. § 2A:40–1, a civil statute, essentially prohibits the same activity proscribed under New Jersey's constitution. N.J.S.A. 2A:40–6, *see supra* note 1, provides a private civil remedy for violations of the constitutional and statutory proscriptions on "gambling." Under the state constitution and, by extension, § 2A:40–1, consideration is not a requisite element of "gambling." Within this broad realm of conduct prohibited by state constitution and civil statute, Glick continues, the New Jersey legislature has delineated specific conduct which is also subject to criminal sanctions. *See* N.J.S.A. § 2C:37–1 through § 37–9.[8] From the foregoing analysis of relevant law, Glick concludes that the Sweepstakes is prohibited by the state constitution and civil statute, or that it is a "lottery" specifically prohibited by the criminal statute.

MTVN argues, and I agree, that N.J.S.A. § 2A:40–6 is a quasi-penal statute which allows a private plaintiff to seek to impose a civil penalty upon a defendant. While the New Jersey Constitution and N.J.S.A. § 2A:40–1 both prohibit gambling generally, neither defines just what an unlawful gaming transaction, or gambling, is. Consequently, both civil provisions must be construed in conformity with the prevailing criminal gambling statutes to ascertain just what type of activity they proscribe.

The current New Jersey criminal statutes relating to gambling offenses, N.J.S.A. § 2C:37–1 through § 37–9, were enacted in 1978. The criminal code defines "gambling" to mean:

---

**7.** The New Jersey constitution precludes the legislature from authorizing "gambling of any kind" unless the "specific kind, restrictions, and control thereof" have been approved by the electorate at a general referendum. N.J. CONST. art. IV, § VII, ¶ 2 (1947); *see Martell v. Lane*, 22 N.J. 110, 123 A.2d 541, 545 (1956).
> N.J.S.A. 2A:40–1 provides:
> All wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, shall be unlawful.

**8.** I cannot agree with Glick that current New Jersey law delineates two different types of "gambling," one requiring no consideration and subject to civil liability, and another requiring consideration and subject to criminal sanctions. Glick has not cited, and this court has not found, any contemporary New Jersey case holding that consideration is not a requisite element under the New Jersey constitution and civil gambling statutes.

*staking or risking something of value* upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

N.J.S.A. 2C:37–1(b) (emphasis added).

The code defines "lottery" to mean:

an unlawful gambling scheme in which (a) the players *pay or agree to pay something of value* for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value.

N.J.S.A. 2C:37–1(h) (emphasis added).

Construing the relevant statutory and constitutional provisions, the New Jersey courts have identified three components of "gambling": chance, prize, and price. *See* New Jersey Att'y General Formal Opinion 9–1978 (June 23, 1978); *see also Carll & Ramagosa, Inc. v. Ash*, 23 N.J. 436, 129 A.2d 433, 438 (1957); *State v. Ricciardi*, 32 N.J.Super. 204, 108 A.2d 111, 113 (1954), *aff'd*, 18 N.J. 441, 114 A.2d 257 (1955); *O'Brien v. Scott*, 20 N.J.Super. 132, 89 A.2d 280, 282 (1952); New Jersey Att'y General Formal Opinion 6–1983 (June 1, 1983).[9]

■ The current statutory definitions of both "gambling" and "lottery" require that "something of value" be risked. The criminal code defines the term "something of value" to mean:

... any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge. This definition, however, does not include any form of promise involving extension of a privilege of playing at a game without charge on a mechanical or amusement device, other than a slot machine as an award for the attainment of a certain score on that device.

N.J.S.A. 2C:37–1(d). Thus, there is no gambling under New Jersey law if the participant is not required to risk "something of value." *See, e.g.,* N.J. Att'y General Formal Opinion No. 6–1983 (casino promotions in which free tickets or coupons were given to all interested parties in anticipation of later drawings for prizes not gambling under 1978 statute because participants not risking "something of value"); New Jersey Att'y General Formal Opinion No. 9–1978 (cable television company "bingo" game with monetary prizes not gambling under 1964 "lottery" statute where rights to participate are given away at no cost to all who ask); Attorney General Formal Opinion No. 17–1961 (under 1961 statute, contest not gambling where open to general public through general distribution of entry blanks through newspapers and places of business).

Historically, the New Jersey courts have struggled to interpret what "something of value" means. *See* New Jersey Att'y General Formal Opinion No. 6–1983 at n. 2 ("Over the decades the courts in New Jersey have struggled to specify the outermost boundary of the 'something of value'

---

**9.** New Jersey has a clear, long-standing and comprehensive policy against gambling. However, New Jersey's sweeping constitutional prohibition against all types of gambling has, over the years, been modified by constitutional amendment approved by a general referendum legalizing certain types of gambling activities. *See, e.g., Atlantic City Racing Ass'n v. Att'y General*, 98 N.J. 535, 489 A.2d 165, 167–170 (1985) (tracing history of state's constitutional and legislative actions regarding gambling); *Carll & Ramagosa, Inc. v. Ash*, 23 N.J. 436, 129 A.2d 433, 434–35 (1957) (same); *see also Caribe Hilton Hotel v. Toland*, 63 N.J. 301, 307 A.2d 85, 88 (1973) ("our public policy no longer can be said to condemn gambling per se. Rather our policy has become one of carefully regulating certain permitted forms of gambling while prohibiting all others entirely.").

concept"). The parties have not cited, and this court has not found, any New Jersey state court decision construing the 1978 statutory definition of "something of value." That the statutory definition is not entirely free of ambiguity only further complicates the task of interpretation. *See id.* (recognizing ambiguity in current definition).

The New Jersey Attorney General has opined, however, that the current statutory definition of "something of value" seems to encompass money or property, or tangibles or intangibles, including personal services, standing in their stead. *Id.* This opinion went on to state that the phrasing of the statute indicates that the "legislative intent was to exclude from the statutory elements comprising the gambling offense the sort of personal inconvenience which will constitute consideration sufficient to support a contract." *Id. Cf. Lucky Calendar v. Cohen,* 19 N.J. 399, 117 A.2d 487 (1955) (finding consideration not necessary element of "lottery" as defined by then-existing statute. Alternatively, if consideration were necessary element, consideration present where participant filled in and delivered entry coupon).

For purposes of its motion, MTVN concedes that its Sweepstakes was a game of chance in which the winners were entitled to prizes. It maintains, however, that because the participants in the Sweepstakes were not required to give "something of value" (i.e., price) to enter, the Sweepstakes was neither an illegal gambling scheme nor a lottery.

The Sweepstakes' official rules did not require that participants risk "something of value" because alternative cost-free means of entry were reasonably available.

One or both of the cost-free methods of entry were publicized in the promotional spots aired several times a day over MTVN channels, in the advertisements MTVN took out in national magazines, through coverage of the Sweepstakes in newspapers and magazines, and on the free entry blanks distributed through Camelot Music stores and at promotional events [10]. Further, the official rules explicitly stated that no purchase was necessary to enter and that all those who entered had an equal chance of winning. Supplemental Affidavit of Leslye Schaefer dated 12/20/90. Finally, as many as 166,600 people entered the contest through the "800" number or by entry blank.[11]

Glick argues that while MTVN may technically have provided alternative means of entering the Sweepstakes, it carefully crafted its promotion so that most entries would come through the "900" number. That approximately 87 per cent of the participants utilized the "900" number, Glick maintains, evidences the success of MTVN's promotional slant. Glick further states that, in late September, 1989, he mailed separate requests for a copy of the rules and for the toll-free "800" number. His request for the toll free number was never honored, and he received a copy of the rules only after the contest was over. Affidavit of Barry Glick dated 1/14/91. From these facts, Glick concludes that the "alternate means of entry, while *facially* supporting an argument that the contest was 'free' did, in fact, either require a participant to give something of value or subjected the participant utilizing the alternate means with a disadvantaged opportunity to win." Plaintiff's Brief at 18 (emphasis in original).

**10.** While there is no question that MTVN's promotional information, including its video advertisements, placed primary emphasis on the "900" number, the fact remains that alternative, cost-free methods of entering were available for those who wished to use them.

**11.** Neither party clarified whether the 2000 entry blanks distributed at the Beach Boys concert, *see supra* note 6, were given away only to ticketholders. If this were so, and if this were the only method of distributing entry blanks,

the sweepstakes might be unlawful under New Jersey law. *See* Att'y General Formal Opinion No. 6–1983 (bus tour promotion where bonus available only to those bus patrons selected by drawing constitutes unlawful "gambling" because "the inference must be that part of the patron's ticket price was staked upon the outcome of the drawing"). Further, it is not clear from the parties' submissions just how many of the entry blanks distributed at the concert were actually submitted to MTVN.

The record does not support Glick's contentions. Participants had two months in which to enter the Sweepstakes. Thus, the only people conceivably disadvantaged by utilizing either the "800" number or the mail-in entry forms were those who, having heard about the Sweepstakes in its last days, were not able to meet the October 3 deadline for requesting the "800" number or not able to mail in their entry blank by October 11. In an extensively publicized sweepstakes lasting two months, such a class of people simply are statistically insignificant. More importantly, as all those who entered had an equal chance of winning, there was no risk that certain entrants would secure a more favorable position than others. *See* New Jersey Att'y General Formal Opinion No. 6–1983 (because casino promotion was open to all there was no risk that certain paying participants would secure more favorable position). In sum, Glick has failed to establish the "something of value," or price, element necessary to his gambling claim.[12]

In sum, I do not believe that a $2.00 charge for using a "900" number to phone in an entry to a sweepstakes, when cost-free means of entering are also available, is the type of activity that the State of New Jersey currently proscribes under its gambling laws. While certainly not determinative, that the State chose not to prosecute Viacom or MTVN supports this belief.

For the foregoing reasons, MTVN's motion for summary judgment dismissing the complaint is granted, and Glick's cross-motion for partial summary judgment is denied.

SO ORDERED.

---

**12.** Further, while not necessary to my ruling, I would agree with MTVN that the "cost" of utilizing the "900" number is the type of "lesser act of personal inconvenience" which is excluded from the "something of value" concept. *See* New Jersey Att'y General Formal Opinion 6–1983.