STATE EX REL. DUSSAULT ET AL., RESPONDENTS, *v.* KIL-
BURN ET AL., APPELLANTS.

(No. 8,089.)

(Submitted January 11, 1941.   Decided February 5, 1941.)

[109 Pac. (2d) 1108.] .

*Mr. W. E. Keeley* and *Mr. James B. Castles,* for Appellants,
submitted an original and a reply brief, and argued the cause
orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Lee Metcalf,* Assistant Attorney General, *Mr. Edward T. Dussault,* County Attorney of Missoula County, and *Mr. Randolph Jacobs,* Assistant County Attorney, for Respondents, submitted a brief; *Messrs. Dussault* and *Jacobs* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This proceeding is in equity to enjoin the defendants from maintaining a nuisance on certain described premises in the city of Missoula more particularly designated as a gambling device known as pinball. The cause was tried to the Honorable J. E. Rockwood, Judge of the Eleventh Judicial District, sitting without a jury. Judgment went for plaintiff and defendants appealed. Defendant Kilburn was the owner of the business which operated the pinball machine, and the other defendants are those who placed the machine in the building.

The use of the pinball machine by the defendant Kilburn and its installation by the other defendants was conceded. The issue for determination is whether the court was correct in holding that the machine is a gambling device within the meaning of our gambling statutes, or whether, as contended by defendants, it is a legitimate trade stimulator made available for the entertainment and amusement of patrons of Kilburn and an instrument used as a game of skill and not as a game of chance.

Admissions in the pleadings and undisputed evidence disclose that the description and operation of the machine are substantially the following: It consists of a cabinet or stand about three and one-half or four feet high with a sloping plane or surface studded with small steel pins and containing holes. It has a catapult by the use of which a marble or ball is shot onto the plane with the object of having the ball enter one of the paying holes. To play the game a person places a nickel or a trade check in a slot in the machine. This places the marble or ball in a position for playing. The trade checks are redeemable in merchandise at the rate of 5 cents or more for

each trade check as stamped on each at Kilburn's place of business, and not elsewhere. The machine is so constructed that the pay-off is in trade checks only and not in money. The number of checks received in the pay-off varies according to the hole in which the marble or ball falls. If the player is not successful in getting the marble into one of the proper holes, he receives nothing on the play. The marble or ball is shot from a spring or mechanical device. The power with which the ball is shot depends upon how far back the spring is pulled and, hence, is subject to the control of the player.

In explaining one phase of the operation of the machine defendant Staninger testified: "The board, in turn, has holes with numbers below the holes corresponding with the numbers that may be lighted on the back board; the lights naturally are operated from electrical spinners; the spinners turn and stop on certain switches that turn on certain lights on the back board; then the player must shoot the ball into a hole that corresponds with the light that is lit. The machine also has an electrical and mechanical pay-out mechanism that pays out trade checks, hickeys, etc. Well, after the coin is inserted in the slot that starts the machine in operation why there is a spinner or electrical disk, a disk with electrical fingers, or brass fingers, that turn on from an electrical motor, we might say a vibrator, and these fingers, in turn, stop on certain electrical switches that light corresponding numbers on the back board; there may be one light or up to seven, there are seven different characters, and from one to seven may be lighted on this particular operation; then in turn the player must shoot at the hole that corresponds with the number that is lighted in the back board.

"Q. Then I take it that these fingers on the spinner, on the electrical spinner, have stopped and designate the pay number or numbers, before the operator shoves the plunger? A. Right.

"Q. So he knows in advance what holes he will have to put the ball in? A. Correct.

"Q. Or one of the holes, in order to get trade checks? A. Right."

It was shown that by frequent playing a player might develop skill in the operation of the machine to the extent that he could more than break even. The average player would about break even, whereas the novice was likely to lose. Witnesses testified that the element of skill predominated over that of chance. In explaining how skill may be applied witnesses stated that the player may control the speed of the ball and thus its rebound when it strikes a spring on the top of the board and may also use "English" on the ball in the same manner but not to the same extent as in billiards.

Witnesses demonstrated the use of the machine at the trial. One was a witness who considered himself better than an average player. He tried it 57 times and struck a winning number 24 times. He did not always hit the hole that he "called" but in some instances the ball went into a paying hole that was not called. Another player who had never played the game before won on nearly every shot.

Defendant Kilburn operates a place of business wherein he sells liquors, wines, beer, cigars and tobacco. He held a license as provided in Chapter 153, Laws 1937.

The question before us is whether the use of the machine constitutes a nuisance under section 11124, Revised Codes. If its use constitutes gambling as defined by other sections, then the building in which it is used is a nuisance. Whether or not it is a gambling device depends upon section 11159, Revised Codes, as amended by Chapter 153, Laws 1937. That section makes it a misdemeanor for any person to conduct, run or operate "any game of chance played with * * * any device whatsoever," or to run or conduct or keep any slot machine, or other similar machine or device, for "money, checks, credits, or any representative of value." It provides, however, that certain types of business may procure a license to operate tables for the use and pleasure of their customers where certain games may be played for pastime and amusement "and for the maintenance of which a charge may be made, to be paid by the users by the purchase of trade checks which must be redeemable in merchandise at the going retail price of such merchandise,

which is the stock in trade of such business." It also provides that upon the payment of a license, places of business may exhibit for use and sale to customers "trade stimulators, such as pull boards and ticket boards, where each board so used returns to the owner or business not to exceed the going retail price of the goods disposed of and sold and disposed of through the use of the same."

The court was correct in holding that the device in question is condemned by Chapter 153. Machines of similar construction and operation have been held to be gambling devices. In *Howle* v. *City of Birmingham*, 229 Ala. 666, 159 So. 206, 209, the court in speaking of a machine not wholly dissimilar to that here said: "The game is clearly a gambling contest with the owner and operator on the one side, and the members of the public on the other, who, while seeking a moment of diversion, are willing to hazard a nickel with the hope of winning three times that amount, and in which, as the facts alleged in the bill and the admitted facts show, the owner and operator hold the whip handle, and eventually win the stakes in the profits which the machine takes."

In *Ex parte Davis*, 66 Okl. Cr. 271, 91 Pac. (2d) 799, 809, a similar machine was held to be a slot machine because of the manner and result of its operation. The court in that case quoted with approval the following from the case of *Harvie* v. *Heise*, 150 S. C. 277, 148 S. E. 66, 69: " 'In no field of reprehensible endeavor has the ingenuity of man been more exerted than in the invention of devices to comply 'with the letter but to do violence to the spirit and thwart the beneficent objects and purposes of the laws designed to suppress the vice of gambling. Be it said to the credit of the expounders of the law that such fruits of inventive genius have been allowed by the courts to accomplish no greater result than that of demonstrating the inaccuracy and insufficiency of some of the old definitions of gambling that were made before the advent of the era of greatly expanded, diversified and cunning mechanical inventions.' *(City of) Moberly* v. *Deskin*, 169 Mo. App. 672, 155 S. W. 842".

The same conclusion was reached in the case of *In re Mapa-
karakes,* 169 Misc. 766, 8 N. Y. Supp. (2d) 826. In *City of
Milwaukee* v. *Burns,* 225 Wis. 296, 274 N. W. 273, 275, such
machines were condemned as gambling devices, the court say-
ing: ''The machine makes an appeal to the gambling instinct,
because the player has constantly before him the chance that the
next play will assure him of the right on the next succeeding
play to secure from two to twenty trade checks. Were it not
for this appeal to the gambling instinct, these machines, which
attempt to adhere to the letter of the law while violating its
spirit, would never have been placed upon the market.''

In *State* v. *Coats,* 158 Or. 122, 74 Pac. (2d) 1102, 1105, the
court in speaking of pinball machines said: ''To say that the
operation of pinball machines or slot machines involves any sub-
stantial degree of judgment or skill severely strains the credulity
of any reasonable-minded person. Such machines are con-
structed to win, and they do win. In a game involving skill
or judgment, the player has a fair opportunity to win. Such
opportunity is not afforded the' player who 'bucks' a slot
machine or a pinball machine. No judgment or skill which the
player may exercise has any appreciable effect upon the result.
* * * It is perfectly obvious from the information that the
only act which the player can, by possibility, perform to in-
fluence the result of this operation is to pull back the plunger
a greater or lesser distance, and thereby, in its initial stages,
regulate the speed of the ball. He can send the ball to the
playing surface at greater or lesser speed, but he cannot guide
or influence its course after it gets there. He cannot aim at
anything, as in a game of billiards, or baseball or golf, but
is absolutely limited by the mechanics of the device to propelling
the ball along the so-called channel to the upper end of the
table.''

While the evidence shows that by long practice a certain
amount of skill may be developed, yet we must view the opera-
tion and result of the machine as it is played by the mass
of the patronizing public, with whom it is purely a game of
chance. On this point the supreme court of Oregon in the

*Coats Case,* supra, had this to say: "If it be conceded that an exceptional person might, after long practice, develop such proficiency in the business as to be able on occasion to influence the result of the play in any substantial or perceptible degree, yet it is apparent that, so far as the patronizing general public is concerned it involves nothing more than mere chance." To the same general effect is *Commonwealth* v. *Bowman,* 267 Ky. 602, 102 S. W. (2d) 382.

We are aware that this court in the case of *State* v. *Hahn,* 105 Mont. 270, 72 Pac. (2d) 459, when treating of section 11149, prohibiting lotteries, declared that the test to be applied in determining the character of the game was whether the element of skill predominated over the element of chance. There are other authorities that make the same pronouncement when dealing with lotteries. While that test may be proper when applied to lotteries, it is not a proper test in determining whether Chapter 153 is violated. We believe the correct rule as applied to a case such as this was applied in the case of *Peers* v. *Caldwell,* 85 L. J. K. B. (n. s.) Eng., 754, where the court held that a ■ machine through which a game of skill was played was nevertheless a gambling device when used for the purpose of betting. In other words, an innocent game involving the element of skill alone becomes a gambling device when players bet on the outcome. To illustrate: A game of poker may involve more skill than chance and is innocent when played for pastime and amusement, but constitutes gambling when played for money. In *Miller* v. *United States,* 6 App. D. C. 6, the court said: "It has from an early time been held that a horse race is a game of chance, and so is a game of baseball, and so a foot race, where wagers have been made upon them." (See, also, note in 60 A. L. R. 343; *Sparks* v. *State,* 48 Ga. App. 498, 173 S. E. 216, and *State* v. *Livingston,* 135 Me. 323, 196 Atl. 407.)

Such, we think, is the purpose of the machine in question here as it is used and operated. We find nothing in Chapter 153 that excepts these machines from the operation of the first part of that chapter. (Compare *State* v. *Aldahl,* 106 Mont. 390, 78 Pac. (2d) 935.) The court was correct in enjoining defend-

ants from maintaining the nuisance. The vice of the game consists not alone in the amount of money risked in playing it, but also in the encouragement of the gambling instinct latent in many people.

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ERICKSON, MORRIS and ANDERSON concur.