VAN PELT *v.* STATE.

*(Nashville,* December Term, 1951.)

Opinion filed February 9, 1952.

464

W. WAYNE WILLIAMS, of Memphis, for plaintiff in error.

KNOX BIGHAM, Assistant Attorney General, for the State.

MR. JUSTICE BURNETT delivered the opinion of the Court.

Under a three count indictment the plaintiff in error was convicted on the second count, only, which charged that she "did unlawfully and willfully have in her possession certain gaming devices, commonly known as lottery, or policy slips, with the unlawful and willful intent to encourage and promote gambling." This indictment is based and laid on Code Section 5250 which provides: "No person shall have in his possession any gambling table or any device whatever for the enticement of any person to gamble."

The Code further in Section 11282 fixes the penalty for the violation of the Code Section last above quoted as follows: "Any person convicted of having, or having

had, in his possession any gambling table or other device for the enticement of any person to play or gamble at, shall be fined not exceeding three hundred dollars, and may be imprisoned not more than three months in the county jail."

The indictment obviously is for keeping and exhibiting a gambling device and the words used following this are merely descriptive. The indictment within itself is sufficient to charge an offense under Code Section 5250 first above quoted. Of course under the Code Section on which this indictment is laid the keeping of such a gambling device must be for the purpose of enticing persons to gamble.

Code Section 11292 directs that all laws made for the prevention or suppression of gaming shall be construed as remedial and not penal statutes.

It is further provided by the Code in Section 11293 that in the prosecutions for keeping a gaming table or device "under Section 11282 (above quoted), it is sufficient to charge that the defendant kept or exhibited, or was interested or concerned in keeping or exhibiting, a gaming table or device for gaming, without describing the same more particularly, or alleging in what manner the defendant was concerned in the keeping or exhibiting, or alleging or proving that any money was bet at such table or device."

The record discloses that for a week in the latter part of March, 1951, the police officers of the City of Memphis had under investigation a policy game. They learned that there was an establishment in Jackson referred to as the N.C. and I.C. policy house. A person referred to as a carrier would go from Memphis to Jackson each day in order to obtain the policies for the players and writers in Memphis. It seems that this carrier traveled

by bus and that when she arrived in Memphis she would go to the rear of a building at 889 Linden and from there enter the house. Marcella Crawford was identified as the carrier. Upon entering the house on Linden she would carry a bundle containing the policy returns from the Jackson house. These returns were contained in envelopes, each envelope having written thereon the number of the writer with a circle drawn around it.

It was learned that the plaintiff in error was connected with this operation and a warrant was issued for her arrest. Certain police officers of the City of Memphis took the warrant to the home of the plaintiff in error and placed her under arrest. While under arrest she stated that she wanted to change her clothes and made certain motions, crossing her hands over her chest. She went into a back room where one of the officers saw her slip something out of her bosom and place it between the mattresses on a bed. The officer searched her purse and took from it an envelope with the number 63 written on it and a ring drawn around the number. This envelope contained policy tickets. The officer also removed a similar envelope from between the mattresses. This envelope contained some tickets and some money.

The method of playing the policy game was described by one of the witnesses for the State as follows: "This is a policy book marked 'I.C.' and they have a house called the I.C. House and they used that as identification. The 28 here in the front is the date which this ticket is written and over here is the number sixty-three and that is the writer's number which is written on the front of this envelope. Over here shows that it is the first ticket written for the day. There was a carbon copy made of the ticket; this shows that. The player has three numbers, like 23, 35 and 56. He paid 50¢ on

468

this. On the very bottom is 5—, no, that is 50¢. That is how much they played on and how much they win I don't know. I have never played it in my life. I have seen it played. I have taken it down for the lady I told you about, but I have never played it for myself in my life. Anyhow, they draw numbers and you get so much for the first number and so much for the second and third numbers and if you get all three of them, you get paid off so much for the fifty-cents you have paid. These numbers are in a can or something and they draw them out and stamp them on the tickets to be distributed to the customers.''

 After her arrest the plaintiff in error made a confession voluntarily in which she admitted having the policy slips in her home and which leaves no doubt that they were used in the policy game being operated between Memphis and Jackson. In this confession she says that she got about $15 per week for distributing these policy tickets and books for the writers. The pad used in this policy game and the slips of paper with the I.C. and N.C. House and the various numbers printed thereon and these things could not be considered a gambling device for the enticement of a person to play or gamble at, in, and of themselves, but when taken in consideration with the evidence here that this is what they are used for then they do become a gambling device for the purpose of enticing a person to play or gamble at. Of course to the layman, that is, one who does not know anything about the policy game, these various figures and pads do not mean anything. When these things are explained as they are in this record by one who has had experience with the policy game, then they become a device for the purpose of enticing a person to play or to gamble at. In determining what a gambling device is

one must look to the means, instrument, contrivance or thing by which the policy game is played. The real test to be applied in determining whether or not a device is one used to entice a person to gamble is whether the contrivance that is in this case these various numbers put together on these various slips are an intricate part of the actual gambling where one would win or lose.

This Court in *Cleek* v. *State,* 189 Tenn. 302, 225 S. W. (2d) 70, 71, said: "In the text of 24 American Jurisprudence, page 420, it is said that 'the term "device", as that term is generally employed in such statutes, is meant the tangible means, instrument, contrivance, or thing with or by which money may be lost or won, as distinguished from the game itself', citing a number of authorities in support. The good sense of that statement, as a matter of sound principle, cannot be convincingly disputed."

And again many years ago this Court in *Mitchell* v. *Orr,* 107 Tenn. 534, 64 S. W. 476 said: "It matters not what the unlawful device is upon which the money is received as a hazard, it is gaming."

In Vol. 38 C. J. S., Gaming, Section 1, page 62, the following definition of a "gambling device" is given: "The term has no settled and definite meaning; it is not defined by the common law and often the statutes fail to define it. It has, however, been judicially defined as an invention used to determine the question as to who wins and who loses, among those who risk their money on a contest or chance of any kind; anything necessarily adapted to the use, and necessarily used in the carrying on, of any gambling game; an instrumentality for the playing of a game on which money may be lost or won; anything which is used as a means of playing for money or other thing of value, so that the result

depends more largely on chance than skill; a gaming device. * * * The term is usually limited or restricted to such instruments or contrivances as are intended for the purpose of gaming and such as are used to determine the result of the contest on which the wager is laid; but any game involving the element of skill may become a 'gambling device' when it is used for the purpose of betting.''

In determining whether or not a thing is a gambling device it is our duty to look behind the name, the style and the what not of the thing and ascertain its true character. When we do this, in the light of the present record, it is perfectly obvious and clear without doubt that the slips found in the possession of this woman were used as a gambling device or the means by which the policy game was played.

The State concedes that if the unreported cases of *William Keith* v. *State, Austin Wyndham* v. *State,* and *Conley* v. *State,* are the law applicable then that this case must be reversed. The State contends, and it was the opinion of the trial judge, that these cases had in effect been overruled by the recent opinion of this Court of *Hackerman* v. *State,* 189 Tenn. 130, 223 S. W. (2d) 194, 196. This Court in the Hackerman case referred to the unpublished opinions above but did not expressly overrule them. The effect though of the Hackerman opinion was to overrule these unpublished opinions. We now expressly so do and say that these cases were applicable only to the particular facts of the case and are not authority for future cases. The particular question here involved was not the question involved in the Hackerman case. The question there largely concerned the proper construction to be given to a search warrant under which

certain gambling devices were seized and used as evidence.

It is argued in the present case that the statute using the words "gambling table" and then following it with the term "gambling device", that under the doctrine of ejusdem generis then that the devices must be somewhat the same thing as a gambling table and that this being true that the words gambling devices could not be applied to those things involved in the instant case. This Court though in the Hackerman case expressly held that "This doctrine is a rule of statutory construction and is applicable usually in case of ambiguity of intent. Defendant further contends that the term 'gambling devices' is general and not specific, and that being preceded by the words 'slot machines,' it must be regarded as referring to gambling devices of that character. This rule of construction is only applicable where the intent of the statute or the instrument under consideration is ambiguous and doubtful. We do not think that such is the case here, and we do not interpret the term 'gambling devices' to be limited to the meaning insisted on by defendant, but rather construe the term as it is generally used and accepted in every day usage."

This Court also in the Hackerman case, supra, quoted with approval from a Pennsylvania case wherein *Rosen* v. *Superintendent of Police,* 120 Pa. Super. 59, 181 A. 797, it is said: "Money is not, ordinarily, itself an instrumentality of gambling. It may be, as when men gamble on the toss of a coin. But usually it is the stake or profit of gambling, not an instrumentality, device, or apparatus for gambling. Cards, dice, roulette wheels, slot machines, punch boards, certain kinds of boards or tables, lottery tickets, policy slips, 'numbers' books and slips are among the common forms of gam-

bling devices and apparatus." We think therefore that by adopting this quotation with approval this Court recognizes that "policy slips * * * are among the common forms of gambling devices". If the Hackerman case is not recognized as authority for this statement, we now so hold.

We also said in the Hackerman case that: "Suffice it to say here, we are of opinion that 'gaming devices' mean any kind of articles, or collection of articles, commonly and ordinarily used in gaming."

We think that the testimony complained of given by Officer Hollowell was properly admitted by the trial court. This witness testified about the N.C. and I.C. policy house. The tickets found in the possession of the plaintiff in error are marked N.C. and I.C. The witness testified that Marcella Crawford was the carrier. This was in accord with the statements in the confession given by the plaintiff in error. Obviously then this testimony of Officer Hollowell was relevant and material in that it shed light on the purpose of plaintiff in error in possessing these tickets.

It is also assigned as error that one of the officers made an illegal search of the plaintiff in error after she was arrested. No question was made as to the validity of the arresting warrant and the arrest. The articles discovered were an incident to the arrest. An officer is authorized to search without a search warrant when the arrest is lawful, such has long been the law in this State. *Hughes* v. *State*, 145 Tenn. 544, 238 S. W. 588, 20 A. L. R. 639; *Elliott* v. *State*, 173 Tenn. 203, 116 S. W. (2d) 1009; *McCanless* v. *Evans*, 177 Tenn. 86, 146 S. W. (2d) 354.

The last assignment complains that the sentence imposed is in excess of the punishment prescribed by statute. This is true. The maximum sentence that

can be given an offender under this statute is three months. Code Section 11282, supra. In answer to this assignment the State contends that this judgment can be corrected in this Court by lowering the sentence to the maximum fixed by statute. The State concedes that the general rule is that when the jury fixed punishment in excess of that authorized by statute then this Court can only reverse and remand. *McDougal* v. *State,* 64 Tenn. 660; *Wilson* v. *State,* 103 Tenn. 87, 52 S. W. 869; *Cowan* v. *State,* 117 Tenn. 247, 96 S. W. 973; *Nashville Railway & Light Co.* v. *State,* 144 Tenn. 446, 234 S. W. 327; *Bowmer* v. *State,* 157 Tenn. 124, 6 S. W. (2d) 326. But the State thinks the answer to this is that this rule does not apply in this case because it was the duty of the court, and not the jury, to fix the sentence since this was a misdemeanor case. The State says that so much of the verdict as undertook to fix the sentence amounted to no more than a recommendation and was surplusage. The plaintiff in error made a demand for the jury to fix the fine, at the proper time. It is the contention of the State that limiting the demand for the jury to fix the fine is not a sufficient compliance with the Act, Chapter 82 Public Acts of 1947, Code Section 11760.1. Even though the demand made by the defendant below to fix only the fine was indeed very limited we do not think that such a narrow construction should be given this application. Clearly when the defendant asked that the jury fix the fine it was the intention and the meaning of the defendant for the jury to fix any penalty that was given. This was the construction that the trial court and the jury both gave this request. The jury fixing a penalty of nine months in the workhouse and fixing no fine. We therefore think that since the jury did fix this penalty that

there is nothing that we can do about the matter in view of the authorities above cited except to reverse and remand the cause.

For the reasons stated the case must be reversed and remanded for a new trial.