CARLL & RAMAGOSA, INC., A CORPORATION OF THE
STATE OF NEW JERSEY; S. B. RAMAGOSA & SONS,
INC., A CORPORATION OF THE STATE OF NEW JER-
SEY; MARTIN, LOUIS AND DONALD SCHWARTZ, t/a
FUNCADE; SOL KANE KNOPMAN AND STANLEY J.
DUTKIN, PLAINTIFFS-APPELLANTS, v. ALBERT M.
ASH, CARL HOFFMAN AND LYNN FORCUM, DEFEND-
ANTS-RESPONDENTS.

Argued January 14, 1957—Decided February 18, 1957.

*Mr. David M. Perskie* argued the cause for the appellants (*Messrs. Perskie & Perskie,* attorneys).

*Mr. David M. Satz, Jr.,* Deputy Attorney-General, argued the cause for the respondents (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

JACOBS, J. The Chancery Division dismissed the plaintiffs' complaint which sought to restrain the county prosecutor and the local chiefs of police from interfering with the operation of their games along the boardwalk in Wildwood and North Wildwood, Cape May County. Thereafter the plaintiffs appealed to the Appellate Division and we certified the matter on our own motion.

The plaintiffs operate boardwalk games which have been designated as (1) "Ring the coke bottle," (2) "Guess your weight and age," (3) "Bear Pitch Game," (4) "Bottle Game," and (5) "Dart Game." In the first game the customer purchases six rings for 25 cents and attempts to toss them (from a distance of four feet) around cola bottles. A prize is given for each bottle which is ringed. In the second game the customer pays 25 cents to the operator who guesses his weight or age; if the guess is not within the advertised degree of accuracy, a prize is awarded. In

the third game the customer attempts to toss a nickel (from a distance of 4½ feet) so that it will land and remain on a saucer; if he succeeds he receives a prize. In the fourth game the customer purchases three balls and attempts (from a distance of ten feet) to knock five wooden bottles off a stand on which they are placed; if he succeeds he receives a prize. In the fifth game the customer purchases three darts and throws them at balloons (from a distance of ten feet); he receives a prize for every balloon he breaks. The prizes vary in value up to three dollars. The plaintiffs assert that in the operation of their games skill rather than chance predominates and that consequently no violations of the laws against gambling are involved. The defendants assert that for the average player chance rather than skill clearly predominates but that in any event the operation of the games constitutes unlawful gambling. The trial judge determined that since the games (whether they be designated as predominantly games of skill or chance) were being played for stakes they constituted unlawful gambling within the definitions recently embraced by this court in *Martell v. Lane*, 22 *N. J.* 110, 118 (1956); he denied the plaintiffs' application for continuance of an earlier *ad interim* restraint and dismissed the complaint without awaiting final hearing. If his legal determination is sustained no purpose whatever would be served by permitting the matter to proceed to final hearing since the plaintiffs could not then prevail on their most favorable showing.

At common law gambling was not indictable unless it was tainted with fraud, was accompanied by a breach of the peace, or for other special reason ran counter to public policy. See *State v. Murzda,* 116 *N. J. L.* 219, 221 (*E. & A.* 1936); *Ploscowe, "The Law of Gambling,"* 269 *Annals* 1 (May 1950); 3 *Burdick, Law of Crime* 353 (1946); *Note, "Gambling Laws—Legal and Social Aspects,"* 18 *B. U. L. Rev.* 210 (1938). However, early English statutes did expressly prohibit various types of gambling and prescribed penalties. See *Burdick, supra,* 354. In American Colonial days gambling, particularly in the form of lotteries, was

not uncommon. See *Lucky Calendar Co. v. Cohen*, 19 *N. J.* 399, 410 (1955), on rehearing, 20 *N. J.* 451 (1956); *Peterson, "Obstacles to Enforcement of Gambling Laws,"* 269 *Annals* 9 (May 1950). In Colonial New Jersey, as elsewhere, lotteries were authorized to finance educational and religious institutions as well as other less worthy causes. See *Dombrowski v. State*, 111 *N. J. L.* 546, 548 *(Sup. Ct.* 1933). However, flagrant abuses and adverse social and economic effects soon led to restrictive legislation. In 1748 "An Act for the more effectual preventing of Lotteries" declared in its preamble that lotteries and other gaming had become common and, if not prevented, might ruin the credit of the colony "and be a Hindrance to Trade and Industry, and a great Temptation to Vice, Idleness, and Immorality." *Allinson, Acts of the General Assembly, p.* 187 (1776). See also *Nevill, Acts of the General Assembly* 405 (1752); *Nevill, Id.* 362 (1761). In 1797 "An Act to prevent gaming" provided *inter alia* that all playing at cards, dice, billiards, tennis, shuffleboard and all cockfightings "for money, goods, chattels, or other valuable thing" shall be prosecuted and proceeded against by indictment. *Paterson, Laws of New Jersey, p.* 224 (1800). See also *Paterson, Id. p.* 238. In 1844 the people adopted a Constitution which contained an express provision declaring that "No lottery shall be authorized by this state" and that "no ticket in any lottery not authorized by a law of this state shall be bought or sold within the state." *Art.* IV, *Sec.* VII, *par.* 2. See *State v. Shorts,* 32 *N. J. L.* 398 *(Sup. Ct.* 1868). In 1871 the Legislature provided that "all wagers, bets or stakes, made to depend upon any race, or upon gaming by lot or chance, or upon any lot, chance casualty or unknown contingent event whatever, shall be unlawful." *L.* 1871, *c.* 578, *p.* 109. See *N. J. S.* 2*A*:40–1. In *Brown v. State,* 49 *N. J. L.* 61 *(Sup. Ct.* 1886), the court held that a tavernkeeper who permitted his patrons to play cards with the loser paying for drinks could be adjudged guilty of keeping a disorderly house; in the course of his opinion Justice Van Syckel pointed out that "it is just as clearly gaming to play cards

for a glass of beer as it is to play for a barrel or ten barrels of beer. The difference is only in the value of the stake played for." But *cf. State v. Hall,* 32 *N. J. L.* 158 (*Sup. Ct.* 1867).

Towards the closing part of the 19th Century the Legislature passed several laws which were designed to remove or ease certain of the restrictions against gambling; the reaction was immediate and in 1897 the people adopted a constitutional amendment which continued the pre-existing provision against lotteries and provided additionally that no "gambling of any kind" shall be "authorized or allowed" within the State. *Art.* IV, *Sec.* VII, *par.* 2; *Baisden, Charter for New Jersey,* 25, 28 (1952). During the following year a general revision of the Crimes Act was adopted (*L.* 1898, *c.* 235, *p.* 794); it provided that "all playing for money or other valuable thing" at cards, dice, billiards, tennis, shuffleboard and all cockfightings shall be misdemeanors (see *N. J. S.* 2A:112–1); it also provided (in *section* 65) that any person who shall keep a place to which persons may resort "for gambling in any form" shall be guilty of a misdemeanor. See *N. J. S.* 2A:112–3. In 1907 the Legislature adopted a supplement to the Crimes Act (*L.* 1907, *c.* 140, *p.* 375) which provided that any person who keeps in his premises a slot machine or device in the nature of a slot machine shall be guilty of a misdemeanor. *N. J. S.* 2A:112–2; *State v. Ricciardi,* 18 *N. J.* 441 (1955). In 1939 the Constitution was amended to allow pari-mutuel betting at race tracks (*Art.* IV, *Sec.* VII, *par.* 2), and in 1947 a new Constitution was adopted which provided that "no gambling of any kind shall be authorized" unless the "specific kind, restrictions and control thereof" have been heretofore or are hereafter authorized by vote of the people. *Art.* IV, *Sec.* VII, *par.* 2. In 1953 the new Constitution was amended to authorize bingo and raffles by charitable organizations under legislative restrictions and controls and subject to local option. *Art.* IV, *Sec.* VII, *par.* 2; *R. S.* 5:8–1 *et seq.* In 1956 the Legislature passed a bill (*Senate No.* 336) which sought to amend *N. J. S.* 2A:112–1 so as

to restrict it expressly to situations in which "art or skill is not required," but it was vetoed by the Governor who expressed the following views:

"If activities such as are here involved are to be authorized, then to insure fair treatment to both the players and the operators, detailed restrictions and controls should be formulated. Consideration should be given to the desirability of a requirement for approval of such activity by the voters of a municipality before it may be carried on therein, to provision for control and supervision of the activity by a governmental unit, and to provision for a tax on the revenues thereof. When and if such controls and restrictions have been formulated, the entire proposal should be submitted to the people at a general election. The Constitution so requires and in so doing recognizes the desirability, in many instances, of submitting to the people the decision of important questions. Such submission to the people makes for a more healthy and responsive democracy."

The cases throughout the country have displayed much confusion as to what bearing the dominance of skill has in the determination of whether a particular game constitutes unlawful gambling. See *Hunter v. Mayor and Council of Teaneck Tp.,* 128 *N. J. L.* 164, 168 (*Sup. Ct.* 1942); *State ex rel. Dussault v. Kilburn,* 111 *Mont.* 400, 109 *P. 2d* 1113, 135 *A. L. R.* 99 (1941); *State v. Coats,* 158 *Or.* 122, 74 *P. 2d* 1102 (1938); *Stevens v. Cincinnati Times-Star Co.,* 72 *Ohio St.* 112, 73 *N. E.* 1058 (1905); *Annotation,* 135 *A. L. R.* 104 (1941). The decisions have generally turned on the real character of the game and the specific language of the local constitutional or statutory provision. See *Burdick, supra,* 356; 2 *Wharton's Criminal Law* (12th ed. 1932), 2035; cf. *State v. Berger,* 126 *N. J. L.* 39, 43 (*Sup. Ct.* 1941). In many instances the courts have differentiated lotteries from other types of gambling, suggesting that the dominance of skill test might perhaps be applicable to the former while inapplicable to the latter. *State ex rel. Dussault v. Kilburn, supra; Westerhaus Co. v. City of Cincinnati,* 165 *Ohio St.* 327, 135 *N. E. 2d* 318 (1956). This suggestion may well have been influenced by the desire to assure the legality of *bona fide* essay and comparable contests which present none of the historical evils of lotteries.

See *Lucky Calendar Co. v. Cohen, supra,* 20 *N. J.,* at *page* 462; *Stevens v. Cincinnati Times-Star Co., supra.* In the instant matter we are not concerned with lotteries in violation of *N. J. S.* 2A:121–1 *et seq.,* or with devices in the nature of slot machines in violation of *N. J. S.* 2A:112–2, or with *bona fide* tournaments in which the participants pay no fees or nominal fees which do not defray the full costs of the prizes ultimately awarded. See *Burdick, supra* p. 359; 24 *Am. Jur., Gaming and Prize Contests* 441 (1939). *Cf. Toomey v. Penwell,* 76 *Mont.* 166, 245 *P.* 943, 45 *A. L. R.* 993 (1926); *Porter v. Day,* 71 *Wis.* 296, 37 *N. W.* 259 (1888). And we shall, for present purposes, assume that the games operated by the plaintiffs do not come within those specifically enumerated in *N. J. S.* 2A:112–1; in *Martell v. Lane, supra,* this court held that those games are unlawful when played "for money or other valuable thing" and it matters not "that skill predominates in the process." The single legal question now presented by the parties for our determination is whether the plaintiffs keep places to which persons resort "for gambling in any form" in violation of *N. J. S.* 2A:112–3. See *State v. Schneiderman,* 20 *N. J.* 442 (1956). If we concern ourselves with the average player who is attracted to the games, then chance rather than skill clearly predominates. See *State v. Ricciardi, supra; Ruben v. Keuper,* 43 *N. J. Super.* 128, 133 *(Ch. Div.* 1956). *Cf. State ex rel. Dussault v. Kilburn, supra; State v. Coats, supra.* But be that as it may, we are convinced that no matter who the players are the plaintiffs' games are still played for stakes and involve the hazarding of money on uncertain events; that being so they constitute forms of gambling within the orbit of *N. J. S.* 2A:112–3 regardless of whether skill or chance predominates. See *Martell v. Lane, supra,* 22 *N. J.,* at *page* 118; *State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 490 (1953); *Westerhaus Co. v. City of Cincinnati, supra,* 135 *N. E.* 2d, at *page* 327; *"5"-Spot Short Range Gun Clubs of America v. Rinehart,* 56 *Ohio App.* 259, 10 *N. E.*

2d 450 (*Ct. App.* 1937); *Bew v. Harston* [1878] 3 *Q. B.*
454; *Peers v. Caldwell* [1916] 1 *K. B.* 371; *Ankers v.
Bartlett* [1936] 1 *K. B.* 147.

When the Legislature, on repeated occasions, provided that
persons who keep places to which persons may resort for
"gambling in any form" it was undoubtedly aware of the
full sweep of its terminology; the legislative history coupled
with the pertinent judicial expressions here and elsewhere
would seem to remove any doubts on this score. In *Bell
v. State,* 37 *Tenn.* 507, 509 (1857), the court condemned
as gambling a merchandising plan which involved the distri-
bution of prizes to purchasers; it defined gaming or gambling
as "an agreement between two or more, to risk money on
a contest or chance of any kind, where one must be loser
and the other gainer"; and it pointed out that some of the
gambling games depend on skill and others upon chance
whereas still others are of a mixed nature. In *Commonwealth
v. Gourdier,* 14 *Gray* 390, 80 *Mass.* 390, 391 (1860), Justice
Hoar expressed the view that the playing of "any game of
chance or skill, on the issue of which money, or property
having any value, depends, is illegal gaming." In *People
v. Weithoff,* 51 *Mich.* 203, 16 *N. W.* 442, 443 (1883), Justice
Cooley remarked: "Let a stake be laid upon the chances
of the game, and we have gaming." In *Fleming v. State,*
125 *Ga.* 17, 53 *S. E.* 579 (1906), the court defined gambling
as the "playing of a game of chance or skill for stakes." In
*Cheeves v. State,* 5 *Okl. Cr.* 361, 114 *P.* 1125, 1126 (*Crim.
Ct. App.* 1911), the court defined gaming or gambling to
include any contest of skill or chance "upon the result of
which a wager is laid." In *State v. Western Union Telegraph
Co., supra,* Justice Wachenfeld, in an opinion delivered for
the entire court, approved the definition of gambling as
"the act of risking or staking anything on an uncertain
event." And in *Martell v. Lane, supra,* Justice Heher, in
an opinion likewise delivered for the entire court, defined
gambling as including wagers, the staking of money or other
things of value on uncertain events, and the playing or
gaming for stakes.

In *Bew v. Harston, supra,* the defendant permitted certain persons to play at a game called puff and dart; the prize was paid for by the participants. Though the game involved skill, the defendant's conviction for permitting gaming at his place of business was sustained. In *Peers v. Caldwell, supra* (cited approvingly in *Martell v. Lane, supra*), the defendant permitted an automatic machine known as "The Clown" to be operated at her place of business. The court assumed that the machine was a "game of skill" but nevertheless sustained the defendant's conviction; in the course of his opinion, Ridley, J. quoted from *Fielding v. Turner* [1903] 1 *K. B.* 867, 871, where Lord Alverstone, C. J. took the view that the owner of the machine "backs his chance against the person who uses it"; the same may, of course, be said with respect to the plaintiffs' games in the instant matter. In *Ankers v. Bartlett, supra,* the court held that the operation of an automatic machine for prizes constituted "gaming"; the opinion of Lord Hewart, C. J. points out that "It is immaterial that the use of this machine requires skill." *Cf. United States v. 24 Digger Merchandising Machines,* 202 *F. 2d* 647 (8 *Cir.* 1953); *United States v. 10, More or Less, Digger Machines,* 109 *F. Supp.* 825 (*D. C. E. D. Mo.* 1952).

The case of *"5"-Spot Short Range Gun Clubs of America v. Rinehart, supra* [56 *Ohio App.* 259, 10 *N. E. 2d* 452], dealt with a shooting gallery which awarded money prizes; the court held that the operation violated the local gambling laws. It pointed out that target shooting is a game which has a large element of skill; that there may, however, be gambling even where "the game depends upon skill"; and that although target shooting is not improper "the element of gambling arises from the bet or wager laid on the results of the game." Here again, as in *Peers v. Caldwell, supra,* the operator of the shooting gallery was backing "his chance" against the customer. In the very recent case of *Westerhaus Co. v. City of Cincinnati, supra* [165 *Ohio St.* 327, 135 *N. E. 2d* 327], the Supreme Court of Ohio rejected the contention that the operation of a "Skill Pool" machine

was not gambling because skill predominated; Judge Taft's opinion for the court said:

"It may be that, in order to have a lottery, the determination as to who gets a prize or how much of a prize he gets must be dependent at least predominantly on the element of chance. *Stevens v. Cincinnati Times-Star Co.*, 72 *Ohio St.* 112, 73 *N. E.* 1058, 106 *Am. St. Rep.* 586. However, although a lottery is a species or form of gambling (see 34 *American Jurisprudence*, 647, *Section* 2; 54 *C. J. S., Lotteries*, § 1, *p.* 844) the term 'gambling' is broader and encompasses more than the term 'lottery.' See *State ex rel. Dussault v. Kilburn*, 111 *Mont.* 400, 109 *P. 2d* 1113, 135 *A. L. R.* 99, 103; *State v. Hudson*, 128 *W. Va.* 655, 664, 37 *S. E. 2d* 553, 163 *A. L. R.* 1265, 1272. Thus, there may be gambling between parties where they stipulate for a price that the determination as to who shall gain or lose (*i. e.*, get or not get the prize) shall depend upon the happening of an uncertain event in which such parties have no interest except that arising from the possibility of such gain or loss. See *Kitchen v. Loudenback*, 48 *Ohio St.* 177, 188, 189, 26 *N. E.* 979, 29 *Am. St. Rep.* 540. Also, although it would be inaccurate to say that there can be a gamble upon something certain, there can be a gamble on the happening of an event, the happening of which may be largely dependent upon skill, even the skill of a participant. This court so held in *Ward v. State, supra*, 17 *Ohio St.* 32, although the authorities outside Ohio on this question are apparently in conflict. See annotation, 135 *A. L. R.* 104, 107, 108. Although there must be an element of chance in order to have gambling, that element can be supplied by having the happening of some future event determine who gets the prize or how much he gets, at least where that event is not certain to happen (see *Lester v. Buel*, 49 *Ohio St.* 240, 255, 30 *N. E.* 821, 34 *Am. St. Rep.* 556) and even though the happening of that event is dependent predominantly upon skill. See also *State ex rel. Dussault v. Kilburn, supra; United States v. 24 Digger Merchandising Machines*, 8 *Cir.*, 202 *F. 2d* 647; *Ankers v. Bartlett* (1936), 1 *K. B.* 147; *United States v. Frodenberg*, 8 *Alaska* 251; 24 *American Jurisprudence*, 407, *Section* 13. But see *Rouse v. Sisson*, 190 *Miss.* 276, 199 *So.* 777, 132 *A. L. R.* 998."

New Jersey's comprehensive policy against gambling (except where specifically authorized by the people) has been clear and long standing. *State v. Hozer,* 19 *N. J.* 301, 308 (1955); *State v. Morano,* 134 *N. J. L.* 295, 299 (*E. & A.* 1946). Nevertheless, efforts by private operators to circumvent it have persisted and our courts have frequently been called upon to strike them down. Only last term the *Martell*

case unequivocally condemned games of skill or chance which involved stakes or wagers, and while it dealt with *N. J. S.* 2*A* :112–1 its controlling principles are, in view of *N. J. S.* 2*A* :40–1 and *N. J. S.* 2*A* :112–3, fully applicable to the instant matter. *N. J. S.* 2*A* :40–1 provides that all wagers, bets or stakes made to depend upon any contingent events shall constitute unlawful gambling and *N. J. S.* 2*A* :112–3 provides that any person who keeps a place to which persons may resort for gambling in any form shall be guilty of a misdemeanor. We find that the plaintiffs' activities come within the express terms of the foregoing enactments. Their operations involve wagers, bets or stakes which are dependent upon contingent events and the keeping of places for such purposes. The player pays a participating fee and receives a prize upon a later happening which may or may not occur; it matters not that the prize is money's worth rather than money itself or that the money risked by the player on a single game is small. In substance, the operator wagers with the player that he will not achieve the result which entitles him to the prize; if the player fails he forfeits what he has put up and receives no prize in return; if he succeeds the operator retains what was put up but forfeits the prize. It may well be true, as the plaintiffs stress, that the games afford amusement and are in themselves innocuous enough, but the defendant officials are objecting not to the games, as such, but to their being played for prizes in violation of law.

We are satisfied that the Chancery Division properly dismissed the plaintiffs' complaint and its action is in all respects:

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—Justice WACHENFELD—1.