**UNITED STATES of America,**
**Plaintiff,**

v.

**John W. THOMPSON, Jr., Defendant.**

**No. CR 75–111–BLG.**

United States District Court,
D. Montana,
Billings Division.

April 1, 1976.

Otis L. Packwood, U. S. Atty., Billings, Mont., for plaintiff.

Wade J. Dahood, Anaconda, Mont., for defendant.

## OPINION AND ORDER

RUSSELL E. SMITH, Chief Judge.

The motions for judgments of acquittal made at the close of the Government's case and at the close of all of the evidence, rulings as to which were reserved, are denied.

---

Defendant was convicted of conducting an illegal gambling business in violation of 18 U.S.C. § 1955. That section requires for conviction proof that the alleged gambling business

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

Defendant's motion was based upon a claim that there had been a failure of proof as to each of the required elements.

The business here involved was one in which defendant had printed serially-numbered forecast cards which listed intercollegiate and professional football games to be played on the following Saturday and Sunday. The card, in addition to showing the games, showed a point spread in each game. A player selected three to 12 teams and in effect bet that the teams selected would do better than the point spread shown on the card. If all of the teams selected won (in the sense that they did better than the point spread shown), then the player would be paid some multiple of his bet, which multiple increased with the number of games played. The card showed the multiples, varying from 6 to 300, which would be paid, based on the number of games selected, and, of course, the more games selected, the greater the multiple.

■ R.C.M.1947 § 94–8–401 prohibits the carrying on or operating of:

. . . any game of monte, dondo, fan-tan, tan, studhorse poker, craps, seven and a half, twenty-one, faro, roulette, pangeni or pangene, hokey-pokey, draw-poker, or the game commonly known as round-the-table poker, or any banking or percentage game, or any game commonly known as sure-thing game, *or any game of chance played with cards, dice or any device whatsoever* . . . (Emphasis supplied.)

Defendant argues that the football parlay played with the described cards is not prohibited by the Montana law. There is no doubt that betting on the outcome of an athletic event is a "game of chance" (*State ex rel. District Court v. Kilburn,* 111 Mont. 400, 109 P.2d 1113 (1941)), and the question is whether a football forecast card is "any device whatsoever" within the meaning of the statute.

■ It has been generally held that where cards, papers, or blackboards are used solely for the purpose of making a record of betting they are not "devices" within the meaning of statutes using the word. See Annot., 1 A.L.R.3d 729 (1965) and Am.Jur.2d *Gambling* § 83 (1968). Many of the cases supporting this proposition distinguish between things such as a slot machine, which itself determines the result, and a paper, which records a bet with the result determined by some independent and uncontrolled act, such as a horserace. *See State v. Shaw,* 39 Minn. 153, 39 N.W. 305 (1888), wherein it was said at 307:

The betting is on the races exclusively, and the result is in no way determined by the use of the instrumentalities in question, and no additional element of chance is introduced thereby.

The football parlay card here, however, is more than a record of a bet. It fixes the point spread and gives the house the benefit of ties. The odds, *i. e.,* 6 to 1 for three winners, are fixed by the card and may or may not bear any relationship to the mathematical probability involved. To this extent the card itself adds elements apart from the performance of the football teams. True, the card only reflects the house determination of these factors, but from the house standpoint, the football parlay could not be played without the cards. For these reasons I believe that the card itself is a device

indispensable to the game of chance as operated. *See Van Pelt v. State,* 193 Tenn. 463, 246 S.W.2d 87 (1952).

There was evidence from which a jury could find that the business involved five of the people named in the indictment who "conduct[ed] . . . all or part of said business." Defendant ordered from 2800 to 3700 cards per week. He shipped a substantial quantity of these to one Odum in Billings. Odum in turn distributed the cards to Larry Pratt and Robert Blair. Pratt and Blair issued the cards and collected the money, which was delivered to or picked up by Odum on Saturday. On Saturday packages were mailed by Odum in Billings to defendant in Anaconda. It was shown that six checks in amounts ranging from $215.00 to $1222.00 were sent by Odum to Thompson. From this a jury was entitled to infer that the tickets were sent to Odum for distribution in Billings, that Odum was authorized to select persons to distribute them, and that defendant accepted money in some amount from the Billings operation. Defendant himself caused the tickets to be delivered to Lee Corkish in Butte, who in turn took bets and turned the proceeds over to Thompson. There was evidence of distribution by persons other than those mentioned, but these five were sufficient to satisfy the statute. " 'Each person, whatever his function, who plays an integral part in the maintenance of illegal gambling, conducts an "illegal gambling business." ' " *United States v. Jones,* 491 F.2d 1382, 1384 (9th Cir. 1974).

■ The contention that the evidence did not show a substantially continuous operation for thirty days fails. Defendant's activity commenced October 1, 1975, and terminated about November 22, 1975, when the FBI raided the establishments involved. The pattern of activity within each week, with some minor variations, was this: Tickets were ordered from The Leader, an Anaconda printer, on Wednesday for the games on the following weekend. They would be shipped so as to reach Butte and Billings on Thursday. On Thursday afternoon, on Friday, and sometimes on Saturday morning, the tickets were played. On Saturday they were picked up by Odum or Thompson. On Monday Odum or Thompson would deliver sufficient money to the distributors to cover the winning tickets they had distributed, and the ultimate pay-offs to the customers would be made during the rest of the week. The question of "substantial" continuity was left to the jury, and the evidence is more than ample to sustain their verdict.