188 N.J. Super. 372 (1982)
457 A.2d 847
BOARDWALK REGENCY CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, AND AMERICAN BACKGAMMON CHAMPIONSHIPS, INC., A CORPORATION OF THE STATE OF NEVADA, PLAINTIFFS,
v.
THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Atlantic County.
Decided December 7, 1982.
*373 Nicholas Casiello, Jr. for plaintiffs (Horn, Kaplan, Goldberg & Gorny, attorneys).
Carol M. Henderson, Deputy Attorney General, for defendant (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
GRUCCIO, A.J.S.C.
In this action plaintiffs Boardwalk Regency Corporation and American Backgammon Championships, Inc. seek a declaratory judgment that a proposed backgammon tournament scheduled to be held on March 16-20, 1983 at the Boardwalk Regency casino hotel would not violate any state laws and therefore would not subject plaintiffs to criminal prosecution by defendant in the event the tournament is held. Pursuant to consent order, discovery was conducted on an expedited basis and trial was held on November 30, 1982 upon a stipulation of facts. The stipulation, received in evidence as Joint Exhibit 1, together with other exhibits and credible evidence offered at trial, revealed the following.
*374 The main event, or "main draw," of the subject tournament is comprised of the following three divisions: beginner, intermediate and championship. Players seeking to enter any division of the tournament would be required to post a nonrefundable entry fee of $50 (beginner level), $150 (intermediate) or $250 (championship). Entrants are required to fill out an application form, and a cursory screening of all applications received is performed. Money prizes are to be awarded to the tournament winners from a "prize pool," consisting of the players' entry fees plus $20,000 to be contributed by plaintiff Boardwalk Regency Corporation. To win prize money a player must either win three matches or rounds in the main draw of the tournament or achieve first, second, third or fourth place in each division overall. (A player who loses in any of the first three rounds has a chance to re-enter the tournament and to place in his respective division if he posts a second entry fee and enters the "Second Chance" bracket.)
As to the game itself, backgammon is a board game in which two opposing players attempt to advance all 15 of their respective markers off the board before their opponent does. Moves are made in accordance with the numbers indicated on two dice which are rolled at the start of each player's turn.[1] In the tournament format, a victory in a game is worth one or more points, and several points are needed to win a match or round from an opponent. Seven points are needed to win a round in the beginner division, 11 in the intermediate division and 15 points are required for winning a match in the championship level of the tournament.
*375 Defendant submits that the proposed tournament, with the requirement of a nonrefundable entry fee for all players and substantial cash prizes for the winners, violates one or more of the criminal laws of this State. Plaintiffs' position is that the game of backgammon does not depend "in a material degree upon an element of chance," and therefore is not "gambling" or a "contest of chance" prohibited under New Jersey's recently enacted Code of Criminal Justice, N.J.S.A. 2C:37-1 et seq.

I
The starting point for this inquiry must be the New Jersey Constitution (1947), Art. IV, § VII, par. 2, which reads:
No gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by, the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by, the legally qualified voters of the State voting at a general election.
This clear constitutional expression renders irrelevant plaintiffs' statutory argument that the new Criminal Code, by implication, recognizes backgammon as a contest of skill and not constituting gambling. Even if the court were to read N.J.S.A. 2C:37-1 et seq. in the manner advanced by plaintiffs, this statutory interpretation would be insignificant in the light of the constitutional mandate forbidding the Legislature from authorizing any gambling except by a referendum-type vote of the people.[2]
Thus, the issue which first and foremost must be determined is whether the proposed backgammon tournament constitutes "gambling of any kind" under the New Jersey Constitution. An uninterpreted Criminal Code enacted by the Legislature over 30 years after the constitutional enactment offers little guidance or weight to the constitutional definition of "gambling of any kind."
*376 The history of New Jersey legislative and constitutional actions with respect to gambling that led up to the adoption of the above-cited provision in the 1947 Constitution is informatively set forth in Justice Jacobs' opinion in Carll & Ramagosa, Inc. v. Ash, 23 N.J. 436, 438-441 (1957). In sum, that history demonstrates a clear, longstanding and comprehensive policy against gambling, except where specifically authorized by the people. Id. at 445.
Consistent with this longstanding anti-gaming policy, our courts have adopted a broad definition of what constitutes gambling in decisions respecting statutory predecessors to N.J.S.A. 2C:37-1 et seq.[3] That broad definition, set forth in Martell v. Lane, 22 N.J. 110 (1956), and reaffirmed in Carl & Ramagosa, supra, depicts gambling as "including wagers, the staking of money or other things of value on uncertain events, and the playing or gaming for stakes." Carl & Ramagosa, supra, 23 N.J. at 443.
Plaintiffs, citing two earlier Supreme Court decisions [State v. Schneiderman, 20 N.J. 422 (1956), and State v. Ricciardi, 18 N.J. 441 (1955)], seek to have the court adopt a narrower definition of gambling, based on whether skill or chance is the dominant factor in obtaining the desired result in the subject activity. The hair-splitting problems in utilizing such a standard are not difficult to conceive, and the Carl & Ramagosa decision noted that "cases throughout the country have displayed much confusion as to what bearing the dominance of skill has in the determination of whether a particular game constitutes unlawful *377 gambling." Id. 23 N.J. at 441. Accordingly, in interpreting a statute (N.J.S.A. 2A:112-3) which prohibited the keeping of places to which persons resort "for gambling in any form," the Carl & Ramagosa court adopted, not the narrow, dominant element standard, but instead stated:
If we concern ourselves with the average player who is attracted to the games, then chance rather than skill clearly predominates. [Citations omitted.] But be that as it may, we are convinced that no matter who the players are the plaintiffs' games are still played for stakes and involve the hazarding of money on uncertain events; that being so they constitute forms of gambling within the orbit of N.J.S.A. 2A:112-3 regardless of whether skill or chance predominates. [Citations omitted] [23 N.J. at 442]
The court, following Carll & Ramagosa, supra, and the origins of New Jersey gaming regulation and policy, finds that the constitutional term "gambling" must be read broadly and in such a manner as to render unnecessary the exercise of determining whether skill or chance plays a predominant role in the game in question. Utilizing this definition, it is clear that the proposed backgammon tournament is a form of gambling since the scheme involves the hazarding of money on uncertain events in an activity which necessarily comprises elements of both chance and skill.
It follows that the recently enacted criminal statutes cannot be read in such a manner as to authorize a form of gambling which the Constitution mandates is not permitted without a referendum-like vote of the people. Thus, plaintiffs' argument that N.J.S.A. 2C:37-1 et seq. adopts a dominant element standard must be rejected. Therefore, the court holds that the proposed activity in question would be gambling under N.J.S.A. 2C:37-1 and the promotion of the tournament would violate N.J.S.A. 2C:37-2.

II
The above conclusions are not in any way intended to reflect that it is the court's position that the language of the provisions of N.J.S.A. 2C:37-1 et seq. is in conflict with N.J. Const. (1947) Art. IV, § VII, par. 2. On the contrary, the court holds that the *378 proposed backgammon tournament constitutes gambling not only in the constitutional sense of the term but also within the framework of the definitional sections of N.J.S.A. 2C:37-1 et seq. In the statutory scheme, "gambling" is defined as:
Staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome. [N.J.S.A. 2C:37-1(b)]
"Contest of chance" is defined as:
Any contest, game, pool, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants or some other persons may also be a factor therein. [N.J.S.A. 2C:37-1(a)]
Plaintiffs place great reliance on this latter definition in support of their argument that skill predominates over chance to such a great extent in tournament backgammon that the element of chance, represented by the results of the dice roll on each turn, is reduced to an immaterial factor in the determination of the outcome of the competition.
After reviewing the exhibits admitted into evidence and the testimony elicited from plaintiffs' expert witness, Paul Magriel, the court acknowledges that backgammon, played on its highest level, can and does involve complex strategies and maneuvers incorporating sophisticated theories of mathematics and statistics which at least some highly intelligent players are able to utilize. Furthermore, credible evidence indicates that such strategies on the part of these players, coming into effect after the rolls of the dice, amount to skill which in certain instances can play a significant role in the outcome of tournament play. (It is apparent that the average backgammon player is not as highly competent in these sophisticated systems as plaintiffs' expert, and accordingly that such strategies which Magriel may utilize are not uniformly applied in the game.)
But this recognition of the skill factor is not determinative on the issue of whether chance plays a material or immaterial role in the outcome of the activity. Indeed, the statute acknowledges that a game may be a "contest of chance" "notwithstanding *379 that skill of the contestants ... may also be a factor therein." N.J.S.A. 2C:37-1(a). Thus, the proper focus of the inquiry here is not on the level of skill which may affect the outcome of the contested activity but rather on whether the element of chance is a factor that is material to the final result.
The court, reviewing all of the evidence, finds that the element of chance, represented by the rolling of two dice to begin the game and at the beginning of each player's turn, is a decidedly material element in the game of backgammon. The rolling of the dice constitutes a "future contingent event not under the actor's control or influence" (see N.J.S.A. 2C:37-1(b)) upon which the players risk something of value.
Plaintiffs' expert testified that, in his opinion, the rolls of the dice are a "given" element; that the numbers displayed are a mere background upon which the game's complex strategies are played, and that it is the skill in developing these strategies which are more important than the numbers rolled. However, the credible evidence indicates that this characterization is an unmistakeable understatement as to the role of the dice. The game itself could not be played without the independent chance element provided by the dice. Each turn of the players is begun by the throw of the dice, and each throw determines the moves, and accompanying strategies, that are possible under the rules. The dice are also rolled at the start of each game to decide who plays first, bringing at least some advantage to that player, according to plaintiffs' expert.
Another point deserves mention. Plaintiffs' expert testified on cross-examination that in a backgammon tournament, as more games or points are required to win a match, the role of chance in the final outcome will correspondingly be reduced. Yet in the hard-bound, 404-page book entitled Backgammon, introduced into evidence as Exhibit P-7, the author, plaintiffs' expert, writes (at 269):
Doubling is one of the most important aspects of backgammon; correct doubling decisions alone will give a player an enormous advantage over his opponent. The doubling cube holds the key to being a winner or loser.
*380 In the stipulation of facts submitted to the court, the doubling cube is described. The stipulation explains that the doubling element, when utilized at the option of either player, results in increasing in the number of points attributable to each game, thereby also decreasing the length of a match or round. These factors, when considered in their entirety, indicate to the court that the doubling technique, so vital to the outcome of tournament backgammon play, substantially increases not only the importance of a single game but also the importance attached to the independent, uncontrollable element of chance.
Finally, an article in the June 4, 1979 issue of Sports Illustrated magazine, introduced in evidence as exhibit P-1, provides eyewitness coverage of the final round of a tournament in which plaintiffs' expert was a participant. The article's introduction, reads (at 69), "Paul Magriel is a mathematician and backgammon champion of the world. His enemy is the dice, which obscure the intricate and beautiful patterns of his game." The same account concludes (at 82) as follows:
With one man left to bring into his homeboard in order to start bearing off, Magriel rolled a horrible 1-1. Samuels bore off two more men. He had only two men left on his No. 1 point and would with the game on his next roll. However, Magriel was still in the match so long as he didn't roll 1-1, 2-1, 3-1 or 3-2. Any other roll  29 of 36 possibilities in all  would allow Magriel to bring his last man into his home board and bear one man off. He was slightly better than a 4-to-1 favorite note to get gammoned
Magriel shook his cup and let the dice fall. They bounced crazily around the board and came to a stop. Magriel stared. Samuels stared.
Double aces!
A pause. Then a roar from the crowd. Samuels leaped up and shook Magriel's hand. He had beaten the world champion. The crowd swirled around him. They carried him off to the bar to celebrate.
Magriel sat in his chair in the now empty room, staring in dismay at the double aces. He could not believe what had happened. Resting on the felt surface of the backgammon board, the dice seemed to be mocking him. Magriel shook his head.
There they still were. Double aces. Snake eyes. On this night, the enemy, the agent of disorder and chaos, had triumphed.
This report, offered by plaintiffs and admitted by the participant, Magriel, to be an accurate account upon examination by the court, removes all doubt from this court that the element of *381 chance plays at least a material role in determining the outcome of this activity on which money is risked, no matter how much it is claimed that the role of skill predominated or allowed the finalist to reach that stage in the tournament.
Therefore, the court concludes that (a) under the New Jersey Constitution the proposed backgammon tournament is a form of "gambling" which has not been authorized by the people and (b) the game of backgammon in the stated context is a "contest of chance" and "gambling" within the express provisions of N.J.S.A. 2C:37-1 et seq. Accordingly, this action must be resolved in favor of defendant.
NOTES
[1] The parties are in agreement that the game of backgammon is not an "authorized gambling game" or a variation or composite thereof pursuant to the Casino Control Act. The proposed tournament would be held on premises that are not part of Boardwalk Regency's casino floor. Accordingly, the issues raised in IGP-East, Inc. v. Gaming Enforcement Div., 182 N.J. Super. 562 (App.Div. 1982), are not directly pertinent to this case.
[2] The Legislature may not do indirectly what it may not constitutionally do directly. Jersey City v. Fink, 133 N.J.L. 437, 447 (E. & A. 1945), cert. den. 326 U.S. 797, 66 S.Ct. 493, 90 L.Ed. 485 (1946).
[3] See, e.g., State v. Puryear, 52 N.J. 81, 85 (1968):

Our gambling statutes have been broadly construed in the light of the criminal activity they were designed to reach. As Justice Heher noted in State v. Morano, 134 N.J.L. 295, 299-300 (E. & A. 1946), New Jersey has for many years been committed through constitutional prohibitions to an "all embracive" policy against all forms of gambling; he found "the design of the provision against bookmaking (the crime there involved, R.S. 2:135-3, as amended; now N.J.S.A. 2A:112-2) is ... to enforce the general anti-gaming policy."